## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IMMIGRANT DEFENSE PROJECT and CENTER FOR CONSTITUTIONAL RIGHTS, | |
| *Plaintiffs,* | Civil Action No. 1:20-cv-10625 |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY and UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, | |
| *Defendants.* | |

1.      Plaintiffs Immigrant Defense Project (IDP) and Center for Constitutional Rights (CCR) bring this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq.*, to compel the release of agency records improperly withheld by Defendants, U.S. Department of Homeland Security (DHS) and U.S. Immigration and Customs Enforcement (ICE).

2.      Plaintiffs submitted a FOIA request to Defendants in the summer of 2020, seeking records concerning "Operation Palladium," an immigration surveillance and policing initiative that ICE has implemented in numerous cities across the United States since February 2020. Intended to punish "sanctuary jurisdictions" for enacting protective measures for their immigrant residents, Operation Palladium involves, inter alia, the deployment of Border Patrol Tactical Unit agents—i.e., "immigration SWAT teams"—to homes and workplaces for civil immigration arrests.[1] Since its implementation, community members and immigrant rights advocates in sanctuary jurisdictions such as New York City have reported an escalation in aggressive tactics

---

[1] Caitlin Dickerson, Zolan Kanno-Youngs, and Annie Correal, *'Flood the Streets': ICE Targets Sanctuary Cities with Increased Surveillance*, N.Y. Times (Mar. 5, 2020), https://nyti.ms/3minTB5.

by immigration agents, including heavy surveillance and increases in the number of agents present during arrests, despite the onset and continuation of the COVID-19 pandemic. The implementation of Operation Palladium was also coupled with the Trump administration's deployment of DHS personnel and surveillance technology to Black Lives Matter protests in many cities.

3.     Despite grave public concerns over immigration policing abuses and the unusual deployment of highly militarized immigration agents, DHS and ICE have disclosed minimal, if any, information about the policies and guidelines for targeting and surveilling noncitizens under Operation Palladium, the data and analysis underlying DHS's decision to dramatically intensify its policing, or any information regarding the practical impact of Operation Palladium. The lack of information also raises a question as to whether the deployment of DHS personnel at political protests is part of Operation Palladium.

4.     To address the urgent need for such critical information, Plaintiffs sought records including policies, procedures, and data relating to Operation Palladium and requested a fee waiver and expedited processing of the request. *See* Ex. 1, FOIA Request Letter from IDP and CCR (dated June 17, 2020) ("Plaintiffs' Request"). The public has an urgent interest in understanding how DHS is executing Operation Palladium and whether policies are in effect to protect vital constitutional rights and privacy interests during immigration policing actions that are often warrantless and take place at homes and workplaces. The public also has a time-sensitive need to obtain accurate information about Defendants' practices in order to engage in advocacy and dialogue around President-Elect Joe Biden's executive policies on immigration enforcement and to meaningfully participate in ongoing appropriations debates regarding funding for both DHS and ICE.

5.    Defendants have unjustifiably denied Plaintiffs' request for expedited processing and failed to produce any responsive records. To vindicate the public's statutory right to information about immigration policing practices and policies, Plaintiffs seek declaratory, injunctive, and other appropriate relief to compel Defendants to immediately process Plaintiffs' Request and release records that they have unlawfully withheld.

## JURISDICTION AND VENUE

6.    This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2).

7.    Venue lies in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(e) and 1402(a), as IDP and CCR reside in this district.

## PARTIES

8.    Plaintiff IDP is a non-profit organization whose mission is to promote fundamental fairness for immigrants who have contact with the criminal legal system. IDP engages in litigation, advocacy, and training to carry out its mission. Additionally, IDP disseminates information about the immigration system—including materials obtained through FOIA requests—in accessible ways and is a leader in providing training and support for legal practitioners, community-based organizations, and community members. IDP provides expert information and community-based education on ICE tactics, including surveillance practices, and possible legal and policy remedies. IDP has been tracking ICE's community arrests and raid activity in the New York City area since 2013 to monitor and analyze trends in immigration surveillance, arrests, and detention, in order to share that information with community members, advocates, and elected officials. In July 2018, IDP, in partnership with Plaintiff CCR, launched

ICEwatch, https://raidsmap.immdefense.org, an interactive map that visualizes the tactics and trends of ICE arrests based on the reports received and verified by IDP.

9.      Plaintiff CCR is a non-profit, public interest legal and advocacy organization that engages in the fields of civil and international human rights. CCR's diverse issue areas include litigation and advocacy around immigration, as well as racial and ethnic profiling. One of CCR's primary activities is the publication of newsletters, know-your-rights handbooks, legal analysis of current immigration law issues, and other similar materials for public dissemination. These and other materials are available through CCR's Development, Communications, and Advocacy Departments. CCR operates a website, https://ccrjustice.org, which addresses the issues on which the Center works. CCR staff members often serve as sources for journalist and media outlets, including on issues related to racial justice, police brutality, racial discrimination, and the right to dissent. In addition, CCR regularly issues press releases, has an active social media presence with thousands of followers, and also issues regular email updates sent to over 50,000 supporters about developments and news pertaining to CCR's work.

10.      Defendant DHS is a Department of the Executive Branch of the United States tasked with overseeing, inter alia, immigration enforcement, border security, immigration detention, and immigration and citizenship benefits.  Its component agencies include United States Immigration and Customs Enforcement (ICE), United States Customs and Border Protection (CBP), and its offices include the Office of Intelligence and Analysis (I&A).

11.      Defendant ICE is a component of DHS that enforces immigration and customs laws and is responsible for the detention and removal of immigrants. It has offices in all 50 states.

12.      DHS and ICE are "agencies" within the meaning of 5 U.S.C. § 552(f)(1).

## STATEMENT OF FACTS

### I. Background

13.     As part of its widely publicized anti-immigration agenda, the Trump administration has targeted localities and cities that have enacted measures to protect immigrant residents and to prevent federal immigration enforcement practices from disrupting state and local systems and services. Shortly after President Trump's inauguration in January 2017, he issued an executive order significantly expanding the categories of noncitizens deemed to be "enforcement priorities," faulting "sanctuary jurisdictions across the United States" for "attempt[ing] to shield aliens from removal" and thereby "caus[ing] immeasurable harm to the American people and to the very fabric of our Republic."[2]

14.     Since 2017, the Trump administration has continued its efforts to punish those localities. Such efforts have included not only seeking to withdraw federal funding from state and local governments it deemed insufficiently cooperative with ICE,[3] but also intensifying ICE's surveillance and raids within these localities,[4] including at places that the agency previously deemed "sensitive locations," such as schools and places of worship.[5]

15.     In early 2020, the Trump administration publicly announced that it would begin deploying U.S. Customs and Border Protection (CBP) agents—including 100 specially trained

---

[2] Exec. Order No. 13768, Enhancing Public Safety in the Interior of the United States, 82 Fed. Reg. 8799 (Jan. 25, 2017).
[3] Clyde Haberman, *Trump and the Battle Over Sanctuary in America*, N.Y. Times, Mar. 5, 2017, https://nyti.ms/3gTX31a.
[4] Liz Robbins, *In a 'Sanctuary City,' Immigrants are Still At Risk*, N.Y. Times, Feb. 27, 2018, https://nyti.ms/2Wl6Aod.
[5] *E.g.*, Maddie Hanna, *Concern Rises Following ICE Arrest of Mother After She Dropped Off Child at South Philly school*, Phila. Inquirer, Feb. 18, 2020, https://bit.ly/3no3A6A; Meagan Flynn, *ICE Arrested an Undocumented Immigrant on Church Grounds. They Lied to Coax Him Out, Family and Attorney Say.*, Wash. Post (Sept. 17, 2020), https://wapo.st/34cmzcV. *See generally* U.S. Immigration and Customs Enforcement, Policy No. 10029.2, *Enforcement Actions at or Focused on Sensitive Locations* (Oct. 24, 2011), https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf.

officers from the elite tactical unit known as BORTAC—into "sanctuary jurisdictions" across the country, including New York City as part of a "supercharged arrest operation".[6] DHS officials stated that the BORTAC agents, who are normally deployed at the southern U.S. border, would be present and supporting ICE to conduct "run-of-the-mill immigration arrests" and that they would be "standing by [ICE agents] as a show of force."[7]

16.     This announcement came after weeks of increased ICE raids and arrests in early 2020. In New York City, the escalation was so stark that it prompted Plaintiff IDP to raise the issue to local officials. IDP submitted two letters to City Council Members to inform them of the increase of ICE surveillance and arrests in New York City, including the shooting of a bystander during an ICE arrest in early February 2020.[8] Weeks later, IDP testified before New York City Council about the five-fold increase in reports of ICE sightings and arrests that they had received during the first eight weeks of 2020 as compared to the last eight weeks of 2019, and the increases in aggression tactics and numbers of agents present during immigration arrests.[9]

17.     The New York Times later reported that the expanded surveillance initiative was called "Operation Palladium."[10]. Upon information and belief, Operation Palladium is being implemented across the United States and has corresponded with increased uses of force and other aggressive, intimidating tactics in immigration policing since February 2020.[11]

---

[6] Caitlin Dickerson and Zolan Kanno-Youngs, *Border Patrol Will Deploy Elite Tactical Agents to Sanctuary Cities*, N.Y. Times, Feb. 14, 2020, https://nyti.ms/2LAntJI.
[7] *Id.*
[8] Letter from Carlos Menchaca and Mizue Aizeki to City Council Members (Jan. 24, 2020), https://www.immigrantdefenseproject.org/wp-content/uploads/2020-ICE-arrest-trends-1.pdf; Letter from Carlos Menchaca and Mizue Aizeki to City Council Members (Feb. 14, 2020), https://www.immigrantdefenseproject.org/wp-content/uploads/Letter-ICE-2020.2-1.pdf.
[9] Testimony of Genia Blaser before New York City Council Committee on Immigration and Committee on Hospitals (Feb. 28, 2020), https://www.immigrantdefenseproject.org/wp-content/uploads/2.28.2020-City-Council-Testimony.pdf.
[10] Dickerson, et al., *supra* n.1.
[11] *Id.*

18.     Defendants' public acknowledgment of Operation Palladium occurred in the wake of the COVID-19 outbreak in the United States. Soon after the initial press coverage of Operation Palladium, ICE announced that despite the pandemic, the agency would continue conducting surveillance and arrests in a decreased manner.[12] It is not clear how ICE's purported plan to decrease arrests during COVID has impacted its surveillance and activities under Operation Palladium.

19.     Notwithstanding the public health crisis, ICE has continued to conduct community surveillance and raids throughout the year and has escalated its activity beginning in the summer. Since mid-July, immigration agents have arrested and detained more than 2,000 people "from their homes, workplaces, and other sites" within "the interior of the country."[13] As recently as October, Defendants publicized the execution of "a week-long targeted enforcement operation" in "sanctuary jurisdictions," resulting in the arrest of more than 170 individuals.[14] Such surveillance and policing activities pose public health risks to members of targeted communities, exacerbate deadly outbreaks in detention facilities across the country, and raise concerns about the underlying principles and guiding policies for DHS surveillance and arrest operations.

## II. Compelling Necessity for Records Sought

20.     Despite widespread criticism and controversy over Operation Palladium and the Trump administration's targeting of sanctuary cities, Defendants have withheld critical

---

[12] U.S. Immigration and Customs Enforcement, *Updated ICE statement on COVID-19* (Mar. 18, 2020), https://www.ice.gov/news/releases/updated-ice-statement-covid-19.
[13] Miriam Jordan, *After a Pandemic Pause, ICE Resumes Deportation Arrests*, N.Y. Times, Sept. 14, 2020, https://nyti.ms/3nl3gFA.
[14] U.S. Department of Homeland Security, *DHS, ICE Announce Arrests of More than 170 At-Large Aliens in Sanctuary Jurisdictions* (Oct. 16, 2020), https://www.dhs.gov/news/2020/10/16/dhs-ice-announce-arrests-more-170-large-aliens-sanctuary-jurisdictions.

information from the public. Defendants have released little to information about their policies and practices for Operation Palladium. There is no clear information available to the public regarding who is targeted and how those individuals are identified, or how and whether the officers involved are trained to comport with constitutional rights or safety measures. Records and documents about agency policies are crucial to public understanding of their impact on communities, as well as the extent to which officer misconduct and constitutional violations occur and how the agency investigates such incidents.

21.    The public has a compelling interest in obtaining clear documentation of the policies for ICE and other DHS agents—including BORTAC agents—for conducting surveillance and arrest activities within cities and the number of individuals apprehended, arrested and/or detained during such operations. This information would significantly contribute to the public's understanding of Operation Palladium and how it fits within Defendants' broader immigration enforcement agenda, issues which "unquestionably implicate[] important individual liberties and privacy concerns which are of immediate public interest." *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 321 F. Supp. 2d 24, 29 (D.D.C. 2004).

22.    Plaintiffs filed their request and administrative appeal against the backdrop of public outcry over the escalation of immigration policing, arrests, and detention during the COVID-19 pandemic,[15] as well as widespread criticism and media attention over the deployment of BORTAC and other CBP agents to political protests in Portland, New York City, and other major cities.[16] It is critical for the public to understand the policies and reasoning underlying the

---

[15] *E.g.*, Miriam Magaña Lopez and Seth M. Holmes, *ICE Agents are still Performing Raids – and Using Precious N95 Masks to Do So*, The Guardian, Mar. 31, 2020, https://bit.ly/3mj69We.

[16] *E.g.*, Fausto Menard, *Warren and Markey Demand CBP Withdraw Plan To Deploy Heavily Armed Officers*, WBUR News, Feb. 17, 2020, https://wbur.fm/2K4I6Nx; Ed Pilkington, *'These Are His People': Inside the the Elite Border Patrol Unit Trump Sent to Portland*, The Guardian, July 27, 2020,

unusual use of CBP agents, apparently against the wishes of states and localities where they have been deployed.[17]

23.     The current presidential transition presents a crucial opportunity for public discussion about Defendants' policing and enforcement activities. During the campaign and after the November 2020 election, President-Elect Biden has pledged to "undo Trump's damage" to the nation's immigration system, including by reforming enforcement practices and ensuring increased training and oversight for ICE and CBP agents.[18] It is thus paramount that the public have the requested information to fully engage in dialogue about executive policy as the new administration transitions into the White House.

24.     Information about programs such as Operation Palladium is also crucial for members of the public to meaningfully engage in public debate surrounding congressional appropriations for DHS and ICE. Congress passed a continuing resolution on September 30, 2020, to keep the government funded through December 11, 2020, at which point another continuing resolution was passed through December 18, 2020.[19] The appropriations process for fiscal year (FY) 2021 is thus still ongoing and will likely continue through the beginning of the calendar year. In its FY 2021 proposed budget, ICE is seeking around $5.7 billion for Enforcement and Removal Operations (ERO), an increase of $1.2 billion from FY 2020.[20] By contrast, the House Appropriations Committee released a bill reducing the ERO budget to $3.3

---

https://bit.ly/3aaixFr; Peter Baker, Zolan Kanno-Youngs, and Monica Davey, *Trump Threatens to Send Federal Law Enforcement Forces to More Cities*, N.Y. Times, July 24, 2020, https://nyti.ms/3gNkkSd.
[17] E.g., Dickerson, et al., *supra* n.6; Ben Fox and Malcolm Johnson, *Mass. Mayors Respond to Planned Border Patrol Operations*, NECN (Feb. 14, 2020), https://bit.ly/3mjxvM3.
[18] *The Biden Plan for Securing Our Values as a Nation of Immigrants*, https://joebiden.com/immigration/# (last accessed Dec. 14, 2020).
[19] *See* Committee for a Responsible Federal Budget, *Appropriations Watch: FY 2021* (Dec. 11, 2020), https://perma.cc/QD7Z-8MAT.
[20] U.S. Immigration and Customs Enforcement Budget Overview at ICE-O&S-116 (Feb. 9, 2020), https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement.pdf.

billion,[21] and the recently released Senate Appropriations Committee's proposed bill would maintain the ERO budget at around $4.46 billion.[22] These developments indicate that the appropriations process will likely be contested and underscore the public's time-sensitive need for accurate information regarding Defendants' use of appropriated funds.

25.    Additionally, accurate and current records on Defendants' activities are essential to Plaintiffs' mission of educating the public. Plaintiff IDP conducts regular Know Your Rights trainings to community members and advocates, and there will be an increased demand for information as a major political transition takes place. Plaintiffs are also engaged in disseminating information on immigration policing to the public, such as Know Your Rights materials and a toolkit[23] containing documents—obtained through past FOIA requests—that pertain to Defendants' immigration enforcement practices, as well as an interactive map[24] that records reports of ICE's deceptive and aggressive tactics in the New York region. The interactive map, ICEwatch, has been accessed by more than 51,000 viewers since July 2018. The information requested is also crucial for Plaintiffs' provision of legal assistance. IDP also operates a free legal hotline that receives thousands of calls each year, many of them from individuals who have been arrested or detained by immigration authorities.

26.    Accordingly, Plaintiffs' Request and the present action are necessary in order to vindicate the public's statutory right to be informed of the federal government's operations, and

---

[21] House Committee on Appropriations, *Appropriations Committee Releases Fiscal Year 2021 Homeland Security Funding Bill* (July 6, 2020), https://appropriations.house.gov/news/press-releases/appropriations-committee-releases-fiscal-year-2021-homeland-security-funding.
[22] Senate Committee on Appropriations, S.0000, 116th Cong., Draft (Oct. 27, 2020), https://www.appropriations.senate.gov/imo/media/doc/HSFY2021.pdf.
[23] Center for Constitutional Rights and Immigrant Defense Project, *Toolkit: Defend Against ICE Raids and Community Arrests* (Oct. 28, 2020), https://ccrjustice.org/toolkit-defend-against-ice-raids-and-community-arrests.
[24] Center for Constitutional Rights and Immigrant Defense Project, *ICEwatch* (2020), https://raidsmap.immdefense.org/.

to correct Defendants' refusal to be open, transparent, and responsive regarding Operation

Palladium.

**III. Plaintiffs' Request for Information**

27.     On June 17, 2020, Plaintiffs mailed a request for records on Operation Palladium

pursuant to FOIA, 5 U.S.C. § 552, *et seq.*, to Defendants.

28.     Plaintiffs' Request seeks the following records that relate to Operation Palladium:

- DHS and ICE policies, memos, or guidances, relating to Operation Palladium;

- DHS and ICE policies, memos, training materials or guidances relating to surveillance tactics;

- Any and all records regarding the process ICE uses to determine who to target as part of Operation Palladium;

- Emails that reference "Operation Palladium" between DHS or ICE and the New York Police Department, from December 1, 2019, to March 31, 2020;

- Field Operations Worksheets from the New York Field Office dated between January 1, 2020 to April 1, 2020.

29.     Plaintiffs' Request sought expedited processing under 5 U.S.C. §

552(a)(6)(E)(i)(I), citing a "compelling need" for the information because of Operation

Palladium's "immediate and dangerous impact on [] immigrant communities' safety" and the

urgency of obtaining information on immigration policing and surveillance during a pandemic.

30.     Plaintiffs' Request also sought a waiver of applicable fees under 5 U.S.C. §

552(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k), because "disclosure of the requested records is in the

public interest because it is likely to contribute significantly to the public understanding of the

activities or operations of the government and is not primarily in the commercial interest of the

requester." IDP and CCR are non-profit entities with no commercial interest in the records

requested, which are crucial to public understanding of Defendants' operations.

**IV. Defendants' Failure to Respond**

31.     On June 17, 2020, Plaintiffs filed their Request with Defendants via FedEx.

32.     According to FedEx's website, the request was received and signed for by Defendant DHS on June 18, 2020, and by Defendant ICE on June 19, 2020.

33.     Plaintiffs followed up with DHS and ICE via email on July 21, 2020, attaching the FedEx proof of delivery and a copy of the FOIA request.

34.     In a letter dated July 22, 2020, Defendant DHS confirmed receipt of Plaintiffs' Request and stated that due to the nature of the records sought, the request would be transferred to the FOIA Officer for ICE and the Office of Intelligence & Analysis (I&A) (a component of DHS). DHS made no determination as to Plaintiffs' request for a fee waiver or expedited processing.

35.     In an email dated July 23, 2020, Defendant ICE confirmed receipt of Plaintiffs' Request, granted the fee waiver request, and designated reference number 2020-ICFO-67509 for the case. In the same email, Defendant ICE denied Plaintiffs' Request for expedited processing, stating that Plaintiffs had failed to demonstrate that their request met any of the factors specified under 6 C.F.R. § 5.5(e)(1).

36.     On August 13, 2020, Plaintiffs timely appealed ICE's denial of expedited processing pursuant to 5 U.S.C. § 552(a)(6). Defendants acknowledged receipt of the appeal in a letter dated August 14, 2020.

37.     On September 11, 2020, Defendant ICE denied Plaintiffs' administrative appeal of the denial of expedited processing.

38.     To date, Plaintiffs have not received any other correspondence from DHS, ICE, or I&A. Defendants have not produced any responsive records to Plaintiffs' Request.

## CLAIMS FOR RELIEF

### First Claim for Relief:

### Violation of FOIA for Failure to Disclose and Release Responsive Records

39.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 63 as if repeated and incorporated herein.

40.     By failing to make a determination on Plaintiffs' FOIA request within the mandated statutory timeframe, by failing to disclose and release the requested records, and by failing to conduct an adequate search reasonably calculated to uncover responsive records, Defendants have violated the public's right, advanced by the Plaintiffs, to agency records under 5 U.S.C. § 552.

### Second Claim for Relief:

### Violation of FOIA for Improper Denial of Plaintiffs' Request for Expedited Processing

41.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 65 as if repeated and incorporated herein.

42.     Defendants have violated Plaintiffs' rights to expedited processing under 5 U.S.C. § 552(a)(6)(E) and Defendants' own regulations, 6 C.F.R. § 5.5(d).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Order Defendants immediately to make a full, adequate, and expedited search for the requested records;

(b)     Order Defendants to engage in expedited processing in this action;

(c)     Enjoin Defendant DHS from assessing fees or costs for the processing of the FOIA Request;

(d)     Order Defendants to disclose the requested records in their entirety and make copies available to Plaintiffs no later than ten days after the Court's order;

(e)     Award Plaintiffs their costs and reasonable attorney's fees incurred in this
action as provided by 5 U.S.C. § 552(a)(4)(E); and

(f)     Grant each other and further relief as this Court may deem just and proper.


Dated:  December 16, 2020
           New York, NY

s/ Ghita Schwarz
Ghita Schwarz
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6445
gschwarz@ccrjustice.org


s/ Andrew Wachtenheim
Andrew Wachtenheim
Leila Kang*
IMMIGRANT DEFENSE PROJECT
121 Sixth Avenue #6
New York, NY 10013
(212) 725-6421
andrew@immdefense.org
leila@immdefense.org

*Motion for *pro hac vice* admission forthcoming