# EXHIBIT 1

 

June 17, 2020

U.S. Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street SW, Stop 5009
Washington, D.C. 20536-5009

U.S. Department of Homeland Security
Chief Privacy Officer/Chief FOIA Officer
The Privacy Office
245 Murray Lane SW
STOP-0655
Washington, D.C. 20528-0655

**Re: Freedom of Information Act Request**

To Whom it May Concern:

This is a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), on behalf of the Immigrant Defense Project ("IDP") and the Center for Constitutional Rights ("CCR") (collectively "the Requesters") to the U.S. Immigration and Customs Enforcement Agency ("ICE") and the U.S. Department of the Homeland Security ("DHS") for information relating to Operation Palladium. We ask that you please direct this request to all appropriate offices and departments within each agency, including but not limited to the National Fugitive Operations Program, the Criminal Alien Program, ICE Probation and Parole Enforcement, the Mobile Criminal Alien Teams, Enforcement and Removal Operations' ("ERO") New York City Field Office, ERO's Special Response Team, ERO's Targeting Operations Divisions Homeland Security Investigation, and ERO's CLEAR Program within ICE; and also including, but not limited to, the Office of Intelligence and Analysis within DHS.

**Purpose of Request**

This request is in regards to records and data concerning the ICE surveillance and enforcement program "Operation Palladium." As organizations that engage in advocacy and public education on behalf of immigrant communities, IDP and CCR have an interest in understanding the implementation and impact of Operation Palladium, its development and the

goals ICE and DHS have in its enforcement. Because the Requesters disseminate policy and educational materials to the public for no cost, information obtained from this FOIA request will better enable communities they represent as well as the general public in understanding why ICE and DHS have implemented this program and its effects.

### A. Definitions

- Record(s). In this request the term "record(s)" includes, but is not limited to, all Records or communications preserved in electronic (including metadata) or written form, such as correspondences, emails, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, legal opinions, protocols, reports, rules, talking points, technical manuals, technical specifications, training manuals, studies, or any other Record of any kind.
- Agreement(s). In this request the term "agreement(s)" refers to any agreement, written or otherwise; communications; contracts and/or supplements, modifications or addendums to contracts or agreements.
- Communication(s). In this request the term "communication" means the transmittal of information (in the forms of facts, ideas, inquiries or otherwise).
- Local Government(s). In this request the term "local" government includes state/local government, municipal corporations, tribal governments, tribal business entities, and Alaska Native Corporations.
- Target lists[1]. In this request the term "target list(s)" means any list(s) of individuals and associated data and associated data assembled and/or created by any government agency or privately-contracted vendor for a government agency that is sent and/or used by any component of DHS to identify, track, surveil and/or arrest people.

### B. Request for Information

1. DHS and ICE policies, memos or guidances relating to "Operation Palladium"
    - This includes policies, operating procedures, rules, internal policy guidance, training materials, monitoring mechanisms, legal opinions or memoranda.
    - Any updates to ruse policies since the 2006 issuance of Torres' "*Use of Ruses in Enforcement Operations*" (3/6/2006) and Forman and Torres' "*Use of Ruses in ICE Enforcement Operations*" (8/22/2006)
    - Protocols around Information-sharing

---

[1] "Target lists" include those compiled with data provided by outside vendors through automated and non-automated services. See https://notechforice.com/thomson-reuters-refines-target-lists-for-ice-in-house-documents-show/

- Any and all Records from any DHS components reflecting or memorializing ICE protocol for obtaining information or data that is used to identify targets for arrests, operations or any other at-large apprehensions, including but not limited to protocols for obtaining information or data from other governmental agencies, local law enforcement agencies, district attorney offices, parole offices, departments of corrections, and probation offices.

2. DHS and ICE policies, memos, training materials or guidances relating to surveillance tactics.

3. Identification of Targets
    - Any and all Records regarding the process ICE uses to determine who to target as part of Operation Palladium
        - Manuals, policies, or other guidance describing the use of CLEAR database in ICE operations
        - Any and all records, including slides or other materials from trainings, on how target lists are built or created, including the keywords "TRSS" or "Thomson Reuters" or "CLEAR"
        - Target lists sent from ICE to Thomson Reuters/TRSS and Thomson Reuters/TRSS response to those lists, including information regarding all personal data[2] searched and lists of all targets confirmed or rejected as "false positives"
        - All related communications between ICE and Thomson Reuters/TRSS including responses by ICE to the target lists

4. Emails with the term "Operation Palladium" using its full name or any acronym or abbreviation, including "Palladium," between DHS or ICE and the New York Police Department ("NYPD") between the dates of 12/01/2019-3/31/2020

5. Data from any Operation Palladium-related target list from the New York Field Office, including but not limited to arrest date, disposition, comments, nexus[3], and criminal history between 1/1/2020-4/1/2020.

6. Field Operations Worksheets from the New York Field Office dated between 1/1/2020-4/1/2020

---

[2] We are not requesting personal identification of the individuals on these lists.
[3] *See* Attachment A, "Master Copy of Target List, Local Cross-Check August 2016," Tab "1". This target list was produced to IDP and CCR as part of *IDP et al. v. ICE et al.*, 14-cv-6117 (S.D.N.Y. filed Aug. 5, 2014) The key to the list contains a variable titled "Nexus" which provides several options regarding how the information came to ICE.

C. **Format of Production**

Please search for responsive records regardless of format, medium, or physical characteristics, and including electronic records. Please provide the requested documents in the following format:

- Provided via email or on a CD, DVD, hard drive or other hardcopy media;
- In PDF format wherever possible;
- Electronically searchable wherever possible;
- Each paper record in a separately saved file;
- "Parent-child" relationships maintained, meaning that the Requester must be able to identify the attachments with emails;
- Any data records in native format (i.e. Excel spreadsheets in Excel);
- Emails should include BCC and any other hidden fields;
- With any other metadata preserved.

D. **Requesters**

Immigrant Defense Project is a non-profit organization whose mission is to promote fundamental fairness for immigrants accused or convicted of crimes. IDP works to protect and expand the rights of immigrants who have contact with the criminal legal system, including: 1) working to transform unjust deportation laws and policies; 2) minimizing the harsh and disproportionate immigration consequences of contact with the criminal legal system; and 3) educating and advising immigrants, their criminal defenders, and other advocates. IDP disseminates information about the immigration system to the public in accessible ways and is a leader in providing training and support for legal practitioners, community based organizations, and community members. IDP provides expert information and community-based education on ICE tactics, including surveillance practices, and possible legal and policy remedies.

The Center for Constitutional Rights ("CCR") is a non-profit, public interest legal and advocacy organization that engages in the fields of civil and international human rights. CCR's diverse issue areas include litigation and advocacy around immigration, as well as racial and ethnic profiling. One of CCR's primary activities is the publication of newsletters, know-you-rights handbooks, legal analysis of current immigration law issues, and other similar materials for public dissemination. These and other materials are available through CCR's Development, Communications, and Advocacy Departments.  CCR operates a website, http://ccrjustice.org, which addresses the issues on which the Center works. CCR staff members often serve as sources for journalist and media outlets, including on issues related to racial justice, police

brutality, racial discrimination, and the right to dissent. In addition, CCR regularly issues press releases, has an active social media presence with thousands of followers, and also issues regular email updates sent to over 50,000 supporters about developments and news pertaining to CCR's work.

### E. Request for Fee Waiver

The Requesters are entitled to a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) on the grounds that "disclosure of the requested records is in the public interest because it is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). Requesters meet the requirements for a fee waiver because the subject of the request concerns the operations or activities of the government, the disclosure of the information is likely to contribute to a significant public understanding of government operations or activities, the Requesters' primary interest is in disclosure; and they have no commercial interest in the information. See 6 C.F.R. 5.11(b).

As described in above, the Requesters are non-profit organizations dedicated to educating the public and advocating for civil rights, human rights, and immigrant rights, and have undertaken this work in the public interest and not for any private commercial interest. Similarly, the primary purpose of this FOIA request is to obtain information to further the public's understanding of federal immigration actions and policies, and their effects on immigrant communities. Access to this information is crucial for Requesters and the communities they serve to evaluate government procedures and actions, as well as their potential detrimental effects.

Requesters will make any information that they receive as a result of this FOIA request available to the public, including the press, at no cost. Disclosure in this case therefore meets the statutory criteria, and a fee waiver would fulfill Congress' legislative intent in amending FOIA. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers of noncommercial requesters.'").

In the alternative, if no fee waiver is granted and the fees exceed $250.00, please contact the Requesters to obtain consent to incur additional fees. Processing fees should be limited pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("[F]ees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by ... a representative of the news media.").

### F. Request for Expedited Processing

Expedited processing of this request is required because there is a "compelling need" for the information. *See* 5 U.S.C. § 552(a)(6)(E)(i)(I). A "compelling need" may exist where there is an "urgency to inform the public concerning actual or alleged Federal Government activity," and the requesting party is "primarily engaged in disseminating information." 6 C.F.R. § 5.5(e)(ii).

There is an urgent need to inform the public of the policies and decision-making regarding enforcement operations, specifically on Operation Palladium. Operation Palladium has already generated national news, as it was first reported in the *New York Times* on March 5, 2020 and has been reported by other national news media.[4] Operation Palladium is being enforced nationwide, including in New York City, and is having an immediate and dangerous impact on the immigrant communities' safety, including sightings of Border Patrol agents in Brooklyn, New York as recently as mid-March.[5] The reasoning behind sending additional and massive ICE enforcement is frightening and unclear and it is in the immediate public interest to obtain information around it. Despite there being a global pandemic, ICE has publicly stated that it will continue to conduct enforcement nationally.[6] In a declaration signed on May 15, 2020, ICE Assistant Field Office Director, Hector Medina, confirmed that between April 1, 2020 to April 30, 2020, five immigrants were arrested by the New York City ERO Field Office.[7] Further, as shown above, Requester IDP is primarily engaged in disseminating information.

### G. Conclusion

The Requesters certify that the above information is true and correct to the best of the Requesters' knowledge. *See* 6 C.F.R. §5.5(e)(3). If this Request is denied in whole or in part, Requesters' ask that DHS and ICE justify all deletions by reference to specific exemptions of FOIA. The Requesters expect DHS and ICE to release all segregable portions of otherwise exempt material, and reserves the right to appeal a decision to withhold any records or to deny the within application for expedited processing or fee waiver.

---

[4] See *The New York Times*, "'Flood the Streets': ICE Targets Sanctuary Cities With Increased Surveillance", March 5, 2020, available at: https://www.nytimes.com/2020/03/05/us/ICE-BORTAC-sanctuary-cities.html; *The Hill*, "ICE officers deployed to 'flood the streets' of sanctuary cities: report", March 5, 2020, available at: https://thehill.com/changing-america/resilience/refugees/486129-ice-deploying-hundreds-of-additional-officers-to; *The Washington Post*, Trump's immigration policies have already put lives at risk", March 22, 2020, available at: https://www.washingtonpost.com/opinions/trumps-immigration-policies-have-already-put-lives-at-risk/2020/03/22/54593c3a-6a1c-11ea-9923-57073adce27c_story.html.

[5] IDP and CCR's ICEwatch Raids Map, story 1566 (March 11, 2020), available at: raidsmap.immdefense.org.

[6] "Updated ICE statement on COVID-19", March 18, 2020, available at: https://www.ice.gov/news/releases/updated-ice-statement-covid-19

[7] *See* Attachment B, "Seventh Supplemental Declaration of Assistant Field Office Director Hector Medina", submitted to the United States District Court, Southern District, as part of litigation in *Uriel Vazquez-Perez v. Decker*, case number 1:18-cv-10683.

If you have any questions regarding the processing of this request, please do not hesitate to contact Ian Head at:

Ian Head
ihead@ccrjustice.org *(preferred)*
Center for Constitutional Rights
666 Broadway, Floor 7
New York, NY 10012
212-614-6470

Thank you,

Ian Head
Senior Legal Worker and
Open Records Project Coordinator
Center for Constitutional Rights

# ATTACHMENT A

| Country |
| --- |
| AFGHA |
| ALBAN |
| ALGER |
| ANDOR |
| ANGOL |
| ANGUI |
| ANTAR |
| ANTIG |
| ANTIL |
| ARGEN |
| ARMEN |
| ARUBA |
| ASAMO |
| AZERB |
| BAHAM |
| BAHRA |
| BANGL |
| BARBA |
| BELAR |
| BELGI |
| BELIZ |
| BENIN |
| BERMU |
| BHUTA |
| BISSA |
| BOLIV |
| BOSNI |
| BOTSW |
| BRAZI |
| BRUNE |
| BULGA |
| BURKI |
| BURMA |
| BURUN |
| BVI |
| BYELA |
| CAFRI |
| CAMBO |
| CAMER |
| CANAD |
| CAPEV |
| CAYMA |
| CHAD |
| CHILE |
| CHINA |
| CHRIS |
| COCOS |
| COLOM |
| COMOR |
| CONGO |

| Severity |
| --- |
| Aggravated Felony |
| Felony |
| Misdemeanor |

| SEX |
| --- |
| M |
| F |

| ProbPar |
| --- |
| YES |
| NO |

| Referred |
| --- |
| CBP |
| HSI |
| USMS |
| Other |

| NCIC |
| --- |
| 0101 - TREASON |
| 0102 - MISPRISION OF TREASON |
| 0103 - ESPIONAGE |
| 0104 - SABOTAGE |
| 0105 - SEDITION |
| 0106 - SELECTIVE SERVICE |
| 0199 - SOVEREIGNTY |
| 0201 - MILITARY DESERTION |
| 0299 - MILITARY |
| 0301 - ILLEGAL ENTRY |
| 0302 - FALSE CITIZENSHIP |
| 0303 - SMUGGLING ALIENS |
| 0399 - IMMIGRATION |
| 03AA - IMMIGRATION (TRAFFICKING OF FRAUD. IMM DOC) |
| 03AB - ILLEGAL RE-ENTRY INA SEC.101(a)(43)(O) |
| 0901 - WILLFULLY KILL FAMILY WITH GUN |
| 0902 - WILLFULLY KILL FAMILY WTH WEAPON |
| 0903 - WILLFULLY KILL NONFAMILY WITH GUN |
| 0904 - WILLFULLY KILL NONFAMILY WITH WEAPON |
| 0905 - WILLFULLY KILL PUBLIC OFFICIAL WITH GUN |
| 0906 - WILLFULLY KILL PUBLIC OFFICIAL WEAPON |
| 0907 - WILLFULLY KILL POLICE OFFICER WITH GUN |
| 0908 - WILLFULLY KILL POLICE OFFICER WEAPON |
| 0909 - NEGLIGENT MANSLAUGHTER VEHICLE |
| 0910 - NEGLIGENT MANSLAUGHTER WEAPON |
| 0911 - WILLFULLY KILL WITH GUN |
| 0912 - WILLFULLY KILL WITH WEAPON |
| 0913 - HOMICIDE-JOHN OR JANE DOE-NO WARRANT |
| 0999 - HOMICIDE |
| 09AA - VOLUNTARY - MANSLAUGHTER |
| 1001 - KIDNAP MINOR FOR RANSOM |
| 1002 - KIDNAP ADULT FOR RANSOM |
| 1003 - KIDNAP MINOR TO SEXUALLY ASSAULT |
| 1004 - KIDNAP ADULT TO SEXUALLY ASSAULT |
| 1005 - KIDNAP MINOR |
| 1006 - KIDNAP ADULT |
| 1007 - KIDNAP HOSTAGE FOR ESCAPE |
| 1008 - ABDUCT NO RANSOM OR ASSAULT |
| 1009 - KIDNAP HIJACK AIRCRAFT |
| 1010 - KIDNAP MINOR-PARENTAL |
| 1011 - KIDNAP MINOR-NONPARENTAL |
| 1020 - FALSE IMPRISONMENT-MINOR-NONPARENTAL |
| 1021 - FALSE IMPRISONMENT-MINOR-PARENTAL |
| 1099 - KIDNAP |
| 10AA - FALSE IMPRISONMENT |
| 1101 - RAPE WITH GUN |
| 1102 - RAPE WEAPON |
| 1103 - RAPE STRONG ARM |
| 1104 - SEX ASSAULT/SODOMY BOY WITH GUN |
| 1105 - SEX ASSAULT/SODOMY MAN WITH GUN |

| SentenceLength |
| --- |
| JAIL - Less than 90 days |
| JAIL - more than 89 days but less than 365 days |
| JAIL - 365 days or more |
| Probation ONLY |
| Fine ONLY |
| Community Service ONLY |

| Court |
| --- |
| Federal |
| State |
| County |

| Gang |
| --- |
| Member |
| Associate |

| Nexus |
| --- |
| Criminal Complaint |
| Criminal Statute that relates to offense against children |
| Judgment/Commitment Document |
| Police Report |
| Probation Report |
| Personal Contact with Parole/Probation Officer |
| Victim/Witness Statement |
| Child Protective Services Report |
| Other – (Provide Description in Additional Criminality Field) |

# ATTACHMENT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| URIEL VAZQUEZ PEREZ, on his own behalf and on behalf of others similarly situated,<br><br>*Petitioner-Plaintiff,*<br><br>v.<br><br>THOMAS DECKER, *et al.*,<br><br>*Respondents-Defendants.* | No. 18-cv-10683 (AJN)<br><br>S<small>EVENTH</small> S<small>UPPLEMENTAL</small> D<small>ECLARATION OF</small> A<small>SSISTANT</small> F<small>IELD</small> O<small>FFICE</small> D<small>IRECTOR</small> H<small>ECTOR</small> M<small>EDINA</small> |

Pursuant to 28 U.S.C. § 1746, I, Hector Medina, hereby declare under penalty of perjury that the following is true and correct:

1. I am employed as an Assistant Field Office Director ("AFOD") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Office of Enforcement and Removal Operations ("ERO") in New York, New York. I began my career with ICE in September 2005 as an Immigration Enforcement Agent with the New York Field Office, in New York, New York. In September 2017, I was promoted to AFOD, where I provided oversight over the Non-Detained Case Management Unit and the Alternatives to Detention Unit. In August 2019, I was reassigned to the Detained Case Management Unit and the Jail Liaison Unit.

2. I have prepared this declaration, in connection with the court order issued in this case on September 30, 2019 (ECF No. 124), and as modified upon consent of the parties on October 16, 2019 (ECF No. 128), to provide the court monthly updates on data regarding the average and median wait times between an ERO-New York arrest and the filing of the NTA with the Varick Street Immigration Court. The following representations are based on my own

knowledge, experience, consultation with my colleagues, and ICE electronic records and databases.

3. On March 18, 2020, ICE Headquarters issued nationwide guidance to field locations regarding enforcement actions taken during the COVID-19 pandemic. *See* "Has ICE modified enforcement efforts during COVID-19?" located at: https://www.ice.gov/coronavirus, last accessed May 15, 2020. In accordance with that guidance, ERO-New York has focused on those aliens who present public safety risks and aliens subject to mandatory detention.

4. Since approximately the middle of March 2020, the facilities at which ERO-New York detains aliens for removal proceedings have stopped intake for new ICE detainees.

5. I reviewed ERO-New York arrests for April 2020. From April 1, 2020 through April 30, 2020, ERO-New York arrested a total of five aliens for placement into removal proceedings. ERO-New York maintained custody of those aliens for only a very short period of time and such aliens were transferred to other ERO field offices throughout the country for placement into removal proceedings. Because these cases did not remain within ERO-New York's jurisdiction or control, ERO-New York did not file NTAs with the Varick Street Immigration Court. ERO-New York has only taken this action due to the current COVID-19 pandemic, and specifically, the moratorium on intake of new ICE detainees at the detention facilities at which ERO-New York detains aliens for removal proceedings.

6. I continue to review ERO-New York arrests several times a week to ensure compliance with DFOD Joyce's email. I continue to have SDDOs regularly check and update the NTA tracking spreadsheet. ERO-New York continues to monitor the filing of NTAs to ensure timely filing; however, ERO-New York does not track cases for aliens who are transferred to another field office.

I hereby declare under the penalty of perjury that the above statements are true and correct.

Executed at New York, New York this 15th day of May 2020.

_____
Hector Medina
Assistant Field Office Director
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security