# EXHIBIT 7

# New York Field Office
# Operation Palladium



## LIMITED OFFICIAL USE

**HEADQUARTERS APPROVED
OPERATION PLAN**

**ENFORCEMENT DIVISION**

Law Enforcement Sensitive-Official Use Only

*Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. **No portion of this report should be furnished to the media, either in written or verbal form.***

Revised 02/12/2020

# OPERATION PALLADIUM
## Dates: February 24, 2020 – December 31, 2020

## I. <u>Situation</u>

The objective of Operation Palladium is to identify, arrest, and remove removable aliens who present a danger to national security or are a risk to public safety, as well as those who entered the United States illegally or otherwise undermine the integrity of immigration laws and border control efforts. This operation will occur within all ERO field offices, consistent with the Immigration and Nationality Act and Executive Order (EO) 13,768 entitled, *Enhancing Public Safety in the Interior of the United States*.

Enforcement and Removal Operations (ERO) has coordinated with Homeland Security Investigations (HSI) to supplement ERO at-large teams with multiple HSI Special Agents per team; HSI resources and analytical support from the Office of Intelligence will serve as force-multipliers for ERO field teams and targeting centers. Up to (b)(7) Special Agents will be assigned under Operation Palladium to locations shown in Attachment 1. **Processing guidelines for the nationwide Cross Check 2020 and this complementary Operation Palladium are shown in Attachment 2.**

The National Fugitive Operations Program (NFOP) and Targeting Operations Division (TOD) will play leading roles in identifying and targeting. ERO will develop a robust target pool using existing at-large lead sources and through the development of new/enhanced lead sources in Fiscal Year 2020.

The TOD will coordinate with NFOP to communicate lead dissemination protocols and tracking mechanisms, with an emphasis on Leads, ACRIMe At-Large Referrals, HSI Tip Line and NCIC Hit Confirmation data. The ERO Field Offices will actively track the force-multiplying assignments of Special Agents to ERO At-Large efforts.

Prior to commencement of the operation and during the course of this operation, teams will evaluate lead information. Target cases amenable to prosecution will be presented to the U.S. Attorney's Office (USAO) in pursuit of criminal arrest warrants to include, but not limited to, 8 U.S.C. §§ 1326 and 1253. Prosecutions for other offenses will be guided by the August 20, 2007 memorandum, *DRO/OI Protocols*. ERO will also collaborate with U.S. Citizenship and Immigration Services to evaluate criminal alien case referrals for inclusion in the operation.

Upon approval of this operational plan, the Field Office Director (FOD) will collaborate with each USAO in their respective AORs to seek cooperation in obtaining criminal arrest warrants, indictments, and acceptance of prosecutions.

Warning: This document is **UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. **No portion of this report should be furnished to the media, either in written or verbal form.**

Revised 02/12/2020

In addition, the FOD will coordinate with the local HSI Special Agent in Charge (SAC). ICE may involve other federal, state and local law enforcement agencies (LEAs) as a force multiplier, if necessary.

The FOD, Deputy Field Office Director (DFOD) and Assistant Field Office Director (AFOD) have been briefed on this operational plan and support its execution.

### A) Targeted Aliens

Removable aliens will be identified and targeted during this operation. These targets will be reviewed and approved by the FOD or their designated official. Teams will generate target lists.

Enforcement actions may also be taken against non-targeted aliens encountered during the course of this operation. If safe to do so, and there is articulable reason to believe that the non-targeted aliens encountered during the operation are in the United States unlawfully, immigration and criminal history checks should be conducted while at the arrest location. The officer may not move the collateral from the scene in the absence of probable cause. This is because such a physical transfer of a suspect will likely be found an arrest by a reviewing court.

### B) Non-targeted Arrests (Collateral Arrests)

Non-targeted arrests will be accepted for this operation. Consistent with the Fourth Amendment Refresher training provided by the Office of the Principal Legal Advisor (OPLA), if non-targeted individuals who may be removable aliens are present at a target location, officers should remain cognizant that DHS regulations at 8 C.F.R. § 287.8(b) require an immigration officer to have articulable, reasonable suspicion *specific to the individual* before briefly detaining that individual for questioning about alienage (including in the context of a protective sweep). Officers may, of course, conduct consensual encounters (i.e., the immigration officer does not restrain the freedom of movement of an individual, not under arrest, to walk away). 8 C.F.R. § 287.8(b)(1).

Whether an immigration officer's interaction with an individual occurs as a consensual encounter or as a brief detention for questioning (i.e., seizure), an **arrest** for immigration violations may only occur upon a determination that there is **probable cause** that the individual is a removable alien. Courts are likely to

(b)(5)

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020

In case an interpreter is needed, refer to the ERO Language Service Resource Flyer for accessing the Language Line, available 24 hours a day/7 days a week.

### C) Hours of Operation

Prior to the beginning of the operation, team members will be briefed on operational objectives and/or daily activities. Team members will conduct pre-operational surveillance as resources permit. While the operational hours for conducting arrests will be from (b)(5); (b)(7)(E) local time, the team leader(s) will determine the actual duty hours within these timeframes. No operation will begin prior to (b)(5); (b)(7)(E), unless the FOD has reviewed the case and given approval based on specific case justifications. However, no approval will be provided to attempt entry into a residence prior to (b)(5); (b)(7)(E). All activities will be conducted pursuant to ICE, ERO, and NFOP Policies and Procedures. Supervisory staff will change shift hours as needed in order to facilitate the operation.

When a daily target list has been exhausted early in the day, consideration should be given to pursuing additional targets and/or conducting additional casework related to identified targets.

### D) Local Situation

Fugitive Operations Teams will conduct the operation with other resources from local Criminal Alien Program (CAP) and Detained/Non-Detained units, as well as from local LEAs. The FODs must commit all available resources within their jurisdictions. (**See attached Excel spreadsheet for Team and LEA breakdown**)

### E) Operational De-Confliction

The target list will be queried in (b)(5); (b)(7)(E) utilizing (b)(5); (b)(7)(E), (b)(5); (b)(7)(E), (b)(5); (b)(7)(E) and (b)(5); (b)(7)(E) to ensure de-confliction with HSI and other law enforcement entities. Deconflict investigative data and events through (b)(5); (b)(7)(E) and regional deconfliction systems, if available, e.g., (b)(5); (b)(7)(E), (b)(5); (b)(7)(E), and (b)(5); (b)(7)(E), as deemed appropriate (b)(5); (b)(7)(E) This is pursuant to § 2.2 of the ICE Directive 10090.1, *Investigative Data and Event Deconfliction* (Feb. 15, 2019).

Each FOD will inform their respective HSI SAC of the operation, as their agents (b)(5); (b)(7)(E)

~~Law Enforcement Sensitive-Official Use Only~~

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. **No portion of this report should be furnished to the media, either in written or verbal form.**

Revised 02/12/2020

F) **Local Law Enforcement Agencies (LEAs)**

The FOT Supervisory Detention and Deportation Officer (SDDO) shall advise local LEAs prior to the execution of this operational plan. The standard operating procedures for local law enforcement agencies will vary from location to location and should be established through proactive liaison. During the course of the operation, if a target is found to be in an area outside the jurisdictions originally notified as part of the plan, every reasonable effort will be made to notify the newly affected LEA prior to the FOT's arrival and, if that is not possible, as soon as practicable thereafter. In the presence of exigent circumstances, (b)(5), (b)(7)(E)

(b)(5); (b)(7)(E)

G) **Sensitive Locations and 4th Amendment**

Potential enforcement activities near sensitive locations will be conducted in accordance with the current ICE policy. Pre-planned operations conducted near a sensitive area must be reviewed and approved in writing by the FOD and the Assistant Director for Field Operations or the ERO Executive Associate Director according to the memorandum and outlined in this section of the operational plan. All personnel assigned to the operation will be briefed on the policy prior to the operation and that briefing documentation will be attached to the plan. **(List locations and targets here)**

All personnel assigned to the operation including HSI Special Agents must have completed 4th Amendment training requirements within the last six months. In addition, FODs may choose to seek additional training by their respective OPLA Field Location prior to the operation, During the pre-operational briefing, the Office of Chief Counsel will provide a 4th Amendment overview.

H) **Community Issues or Politically Sensitive Issues**

ERO Headquarters (HQ) has socialized the concept of this long-term operation with the ICE Offices of Public Affairs (OPA) and Congressional Relations (OCR). ERO HQ encourages local field office leadership to consult with their local outreach team to conduct media engagements, or other stakeholder engagement, to promote law enforcement actions effectuated by field personnel on a case-by-case basis, with appropriate coordination and approval by ICE HQ.

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020

I) **Minors**[1]

The presence of non-targeted juveniles, including lawful permanent residents and U.S. citizens (USCs), at a target location, or in the care of a targeted alien, will be explored during initial investigation, surveillance and diligent research of available indices, to the extent possible. Should available information indicate that such non-targeted juveniles will likely be present, authorization from ICE supervisors should be obtained prior to taking any enforcement action.

In the event that non-targeted juveniles are identified, or likely to be encountered, family members, care providers and community, as well as federal, state and local juvenile resources, will be identified and a plan of care for non-targeted juveniles will be addressed prior to the commencement of operations. The Field Office Juvenile Coordinator (FOJC) must be involved during the operational planning stage, and there needs to be coordination with the FOJC throughout the operation.

In addition, the utmost care and consideration will be used when dealing with minors, especially when minors are present during interviews or encounters with adults. The questioning of minors will be kept to a minimum and conducted in the least threatening manner and environment possible.

In the event that non-targeted minor(s) is/are encountered unexpectedly, and if the minor does not meet the definition of UAC, the supervisors and team leaders may need to seek assistance from the state or local governmental agency responsible for juvenile issues, i.e., Child Protective Services (CPS). As such, ICE supervisors and team leaders will maintain possession of the agency's appropriate contact numbers to be used as necessary throughout the entirety of the operation.

If non-targeted UACs are encountered, the law requires that ICE notify the Office of Refugee Resettlement (ORR) within 48 hours of the encounter and transfer the minor to ORR within 72 hours. However, the *Saravia* injunction may apply to some UACs. *Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017), *aff'd*, 905 F.3d 1137, 1145 (9th Cir. 2018). To the extent possible, officers should



(b)(5)

---

[1] During enforcement actions, ICE may encounter unaccompanied alien children (UAC). UACs are minors who have no legal status in the United States and for whom there is no parent or legal guardian in the United States; or no parent or legal guardian is available to provide care and physical custody. ICE may also encounter other minors who do not meet this definition. Different legal standards and custodial settings apply to these two groups, so it's important to determine which category applies upon the encounter.

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020



Non-targeted minors who are not UACs will be turned over to local juvenile resources only as a last resort. Such enforcement activity will be conducted consistent with the requirements of ICE Policy No. 11064.2: *Detention and Removal of Alien Parents or Legal Guardians* (August 29, 2017).

In accordance with the Administration's policy, families consisting of parents or legal guardians with their minor children will generally be referred for detention as a family unit as permitted by law and available resources. Families will be referred to Family Residential Centers unless the parent or legal guardian presents a risk to the child(ren). ERO officers and SAs should use the ERO Language Service Resource Flyer as needed for translating the 'Designation of Caregiver' Form. (see the attached 'Designation of Caregiver' form).

J) **Prosecutions**

In instances where an alien is amenable to criminal prosecution, the case will be presented to the USAO/State Attorney's Office as appropriate. If the case is accepted for prosecution, a Form I-247A, Detainer – Notice of Action, will be filed with the agency assuming custody of the alien. If the USAO/State Attorney's Office declines to prosecute, the declination will be recorded in the narrative portion of the Form I-213 and included in the file.

K) **Gangs**

In the event ICE personnel encounter an alien affiliated with a street gang, officers must record the appropriate information on Form I-213 and photograph any tattoos. Where operationally feasible, photos will be taken in residences

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020

where gang tags and/or paraphernalia are present, (b)(5); (b)(7)(E)
(b)(5); (b)(7)(E) .

**ICE Definitions of Gang Member and Gang Associate**

**Gang Member:** A gang member is defined as anyone who admits gang affiliation, convicted of violations associated with 18 U.S.C. § 521 or any other Federal or state law punishing or imposing civil consequences for gang-related activity or association, <u>or</u> falls under two or more of the following criteria, one of which occurred in the previous five years:



(b)(5); (b)(7)(E)

**Associate Gang Member:** An associate gang member is defined as an individual who exhibits one of the above listed gang member criteria but not formally initiated into the gang. The officers/agents conducting the arrest will determine whether indications of association are present.

For minors, please contact Juvenile Family Residential Management Unit to determine if detention is appropriate even if they meet the above criteria for gang member or associate gang member. If a minor alien came to the United States as a UAC, was previously detained in HHS ORR custody but then later released by ORR to a sponsor, has not been issued a final order of removal, and has been or will be rearrested by DHS and indicia of gang membership exists, the minor is a *Saravia* class member.

Warning: *This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. **No portion of this report should be furnished to the media, either in written or verbal form.**

Revised 02/12/2020

Pursuant to court order, ICE must produce *Saravia* class members for a *Saravia* custody hearing within seven days of arrest, at which ICE bears the burden of proof that there has been a change of circumstances justifying ICE's re-arrest of the minor. To wit, that at the time of the re-arrest, there was probable cause to believe that the minor is a danger to the community, danger to him/herself, or is a flight risk. In order to meet this burden, it is crucial that all relevant information pertaining to the reason for the minor's re-arrest is detailed in the Form I-213.

(b)(5)

## II. Mission

To identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally or otherwise undermine the integrity of immigration laws and border control efforts. ERO upholds America's immigration laws at, within, and beyond our borders through efficient enforcement and removal operations.

One of the most important ICE mandates is the enhancement of public safety and the security of the American public. The broad authority of ICE allows for the identification and removal of dangerous, often recidivist, criminals engaged in crimes such as murder, predatory sexual offenses, narcotics trafficking, alien smuggling, and a host of other crimes that have a profoundly negative impact on our society. The Fugitive Operations Division supports this mandate by performing strategic planning and establishing policy designed to augment ICE's ability to arrest and locate these aliens for removal from the United States.

The objective of the FOD-approved Enforcement Operation is to apply an organized, methodical approach to the identification, location and arrest of at-large criminal aliens and public safety threats who present a danger to citizens, immigrants and visitors in the nation's communities.

## III. Execution

### A) Operational Intent

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020

This operation is being conducted in furtherance of E.O. 13768 to promote national security, border security, and public safety.

B) **Concept of Operations**

Special Agents (SAs) from the Special Agent in Charge New York Office will participate. The operation will consist of 15 designated teams in the AOR. The teams will consist of members of the New York FOTs and HSI Special Agents; the teams will also be assisted by Deportation Officers (DOs) from CAP, the detained and non-detained sections of ERO New York Field Office. One DO will be assigned as the team leader for each team and one will be assigned as the File Control Officer (FCO). The teams will be assigned (b)(5); (b)(7)(E) vehicles as well as secure transport vehicles for use during this operation.

Throughout the course of this operation, team resources may be reassigned to other geographical areas to meet operational needs or returned to their official duty posts as deemed appropriate by the SDDO/AFOD. If operationally feasible to do so, liaison will be established with LEAs in the areas in which enforcement efforts will be conducted.

This operation will consist of continuous days of enforcement activities from February 24, 2020 through December 31, 2020.

- February 24, 2020: Operational briefing. All officers participating in the operation will attend the pre-operational briefing. The briefings must include a representative from the Office of Chief Counsel to address 4th Amendment and other pertinent legal considerations.

- February 25, 2020: Officers from the New York FOTs will deploy throughout the New York AOR to initiate arrests.

- February 25, 2020: Upon review and approval of the New York Field Office Director, New York ICE OPA may issue a press release.

C) **Tasks**

1. Field Offices: A copy of the Operational Plan and target lists will be sent to the (b)(5); (b)(7)(E) via (b)(5); (b)(7)(E) and (b)(5); (b)(7)(E) via the (b)(5); (b)(7)(E). Submissions must include the Operational Plan, Signed FOD Signature Page, Target Lists, and Personnel breakdown, along with any additional attachments.

Law Enforcement Sensitive-Official Use Only

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020

2. FODs: Each FOD will be responsible for identifying suitable detention space within each AOR. Should additional detention resources be required, the FOD will coordinate with HQ/Field Operations.

3. The Law Enforcement Support Center (LESC) is available 24 hours per day, seven days per week and will provide support to FOTs conducting operations. All officers/agents participating in the operation should have the contact number for the LESC: (b)(5); (b)(7)(E). When calling the LESC, officers should be prepared to provide their (b)(5); (b)(7)(E)

4. NFOP: Prior to the operation, NFOP will provide HQ/Field Operations with a copy of the approved operational plan.

## IV. Administration

### A) Safety

Mandatory Element: **Safety is paramount.**

1. All participating officers/agents will be fully equipped with both deadly and non-deadly force weapons, service-issued firearms and body armor.

2. Beyond verbally identifying themselves as law enforcement officers, all enforcement personnel must utilize law enforcement identifiers, such as neck badges, belt badges, and outer garments affixed with ICE identifiers.

    i. High-visibility: When conducting high-visibility operations, acceptable means of identification include vest placards or clothing clearly identifying you as a law enforcement officer, such as Agency-issued shirts, windbreakers, and external body armor carriers distinctly marked with "POLICE." In addition, officers must have an ICE badge visible.

    ii. Low-visibility: If circumstances dictate a low-visibility approach, Fugitive Operations Team officers may wear clothing (b)(5); (b)(7)(E) (b)(5); (b)(7)(E) Officers must have police identifiers and/or badges immediately available for display as needed.

3. Officers will not engage in high/low-speed vehicle pursuits.

### B) Logistics

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020

1. Primary processing location: All detainees will be transported to local detention facilities for processing.

    a. Secondary detention and processing site(s) will be determined as needed.

    b. The SDDO will coordinate requests for additional staff to support the enforcement operation. Requests will be made through the FOT AFOD with concurrence from the New York FOD.

2. Per Diem: Lodging and MI&E expenses are not authorized.

3. Removal efforts: Pursuant to ERO's mission of ensuring efficient removal in order to uphold America's immigration laws, the actions below will be performed to facilitate this objective:

    a. Once arrested, all detainees will be transported to the nearest (b)(5), (b)(5), (b)(7)(E) for initial processing. All files will be reviewed by the FOT team leader/SDDO for legal sufficiency prior to the alien being transferred to an appropriate detention facility.

        - No health and safety inspection are required for any facility or equipment being utilized for this operation.
        - No contracts need to be reevaluated.

    b. Each operational team has been instructed to secure any and all legally issued identity documents for all arrestees who will require a travel document for removal. All teams will make every legal effort to secure these documents prior to departing the arrest location. Obtaining these documents at the time of arrest will greatly decrease time spent in detention.

    c. Any arrests that require a Notice to Appear will be presented with the option of a Stipulated Removal to aid in the reduction of detention time, if deemed appropriate by supervisory personnel. To the extent possible, FOD New York will work with their Office of Chief Counsel and EOIR to ensure their availability to approve stipulated removals during the operation.

    d. FOTs will not *target* aliens outside the scope of the Enforcement Operation, although other removable aliens falling within DHS enforcement priorities may be arrested as appropriate if

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020

encountered during the operation, and circumstances dictate such action in accordance with existing policy.

e. Prosecutorial discretion in immigration enforcement matters must be exercised, consistent with all established guidelines with supervisory oversight, by ICE officers/agents. This applies at all levels during the execution of the operation and could be applied during the pre-arrest, arrest, and custody phase. Nothing within this operation plan should be interpreted to supersede local management oversight and execution of prosecutorial discretion protocols.

f. When appropriate, a form of alternative to detention may be utilized if authorized by supervisory personnel.

## C) General Reporting Requirements

1. Daily Reports: The (b)(5); Daily Apprehension Log Report will be submitted once a day by (b)(5); ET for the day's activities up to the time of submission of the report.

2. Field Offices will process ALL (b)(5); (b)(7)(E) entries pursuant to this operation **using Att. 2 instructions**, under (b)(5); (b)(7)(E) in the operational dropdown on the initial event screen.

3. At the conclusion of daily operations, each team leader will ensure that OM2 is properly updated with all FOT arrests and that these arrests are validated in (b)(5); (b)(7)(E)

4. **Quality Assurance:** Officer(s) and support staff will review arrests against the (b)(5); Daily Apprehension Log to ensure that the Daily Apprehension Log is accurate. This review must be completed daily and at the conclusion of the operation. If asked to provide statistics prior to validation, the information must be clearly identified as not validated and subject to change.

5. Significant Event Notification (SEN): A SEN/Significant Incident Report (SIR)/Significant Proposed Enforcement Activity Report (SPEAR) will only need to be submitted if events or incidents occur that warrant their generation in accordance with established policies and procedures.

## D) After-Action Reporting Requirements

13
Law Enforcement Sensitive-Official Use Only

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020

1. December 31, 2020: The New York Field Office will conduct an after-action briefing as soon as practicable after completion of the operation and before the after-action conference.

2. Format: The format for issues will be:
   a. Topic
   b. Discussion
   c. Recommendation(s)

3. ICE OPA will coordinate with the FOD and generate a press release upon completion of the operation.

V. **Command and Control**

1. Primary means of communication will be via radio, telephone and E-mail.

**General**

Emergencies: 911
Sector: 1-800-X-SECTOR (b)(7)(C); (b)(7)(E)
INTERPOL: 202- (b)(7)(C); (b)(7)(E)
INTERPOL 24-hour Command Center (IOCC): 202- (b)(7)(C); (b)(7)(E)
ORR: 202-401-5 (b)(6); (b)(7)(C)
LESC: 802-872- (b)(7)(C)
NCATC POC: (b)(6); (b)(7)(C)   (802) 951 (b)(6)

*Local*

FOD: (b)(6); (b)(7)(C)
DFOD
AFOD: (b)(6); (b)(7)(C)

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020

APPROVING OFFICIAL



(b)(6); (b)(7)(C)

Field Office Director
New York Field Office

(b)(6); (b)(7)(C)

2-22-2020

Assistant Director
Enforcement Division

ATTACHMENTS: (If applicable)
Attachment 1: HSI Special Agent in Charge Assignments to ERO Field Offices
Attachment 2: Processing Guidelines for Cross Check 2020 and Operation Palladium
Attachment 3: *Saravia* flowchart
Attachment 4: Designation of Caregiver
Attachment 5: ERO Language Resources Flyer
Attachment 6: Staffing Breakdown

DISTRIBUTION:

HQ: NFOP, NCATC, Field Operations

Field: FOD, DFOD, Fugitive Operations AFOD

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

Revised 02/12/2020