# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IMMIGRANT DEFENSE PROJECT; and CENTER FOR CONSTITUTIONAL RIGHTS,

        Plaintiffs,

        v.

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

        Defendants.

Case No. 20-cv-10625 (RA)

`

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Andrew Wachtenheim
Immigrant Defense Project
P.O. Box 1765
New York, NY 10027
(212) 725-6421
andrew@immdefense.org

*Attorney for Plaintiffs*

Maria LaHood
Elsa Mota (*Application for New York bar admission pending*)
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
emota@ccrjustice.org

*Attorneys for Plaintiffs*

Ghita Schwarz
LatinoJustice PRLDEF
475 Riverside Dr.
Suite 1901
New York, NY 10115
(212) 219-3360
gschwarz@latinojustice.org

*Attorney for Plaintiffs*

# **Table Contents**

PRELIMINARY STATEMENT ................................................................1

BACKGROUND AND TIMELINE.........................................................2

   I.     DHS and ICE Plan Surge Operations Relating to Palladium
        and Give Interviews to *New York Times* .......................................2

   II.    New York Times Contacts Plaintiff IDP About DHS Surge Operation
        Announcements and Operation Palladium...................................4

   III.   Plaintiffs File FOIA Request ......................................................5

   IV.   Information Related to DHS Surge Operations and
        Operation Palladium is Essential to Plaintiffs' Advocacy and
        Community Education Efforts ...................................................5

ARGUMENT ....................................................................................8

   I.     Standard of Review..................................................................8

   II.    Defendant Failed to Conduct an Adequate Search for
        Relevant Records ....................................................................9

       a.   Defendants Did Not Search Custodian Agencies Clearly Within the
           Scope of Plaintiffs' FOIA Request and Did Not Justify This Failure
           to Search.............................................................................9

             1.   Defendant DHS Should Have Searched Several Agencies
                Very Likely to Be Related to Operation Palladium, and
                Instead Searched Only One Out of Dozens ............................10

             2.   Defendant ICE Also Failed to Search Adequate Custodians
                and Should Have Searched Additional Agencies and Offices..13

             3.   Defendants Failed to Uncover Material Known to Be
                in Their Possession ...............................................................13

             4.   Defendants Did Not Follow Obvious Leads..........................15

             5.   ICE Has Not Provided a Reasonable Explanation For
                Why It Did Not Search These Custodians ...............................15

       b.   Defendants' Selection of Search Terms and File Systems
           Varied Widely and Without Any Rational Basis, and the

Agency Failed to Include Clearly Relevant Key Terms .......................16

III.    Defendant Improperly Redacted and Withheld Information
Under Exemption 5 ...........................................................................................20

    a.   The Deliberative Process Privilege Does Not Apply to
Emails Implementing Final Agency Policy ..........................................20

    b.   The Attorney-Client Privilege Does Not Apply to the ERO
Fugitive Operations Handbook, the Fourth Amendment
Refresher Training for ERO Personnel, and Finalized
Operations Plans ...................................................................................22

IV.    Defendant's Use of Exemption 7(e) is Overbroad and Does
Not Justify Withholding of Training Materials, Manuals or
Staffing Information.........................................................................................25

    a.   Significant Portions of OPLA's Fourth Amendment Refresher
Training, the ERO Fugitive Handbook and the HIS Surveillance
Training Manual Contain Agency Policy, Not Techniques
and Procedures ......................................................................................26

    b.   Staffing Plans Do Not Constitute "Techniques and Procedures for Law
Enforcement Investigations" Shielded Under Exemption 7(e).............28

V.    Some Withheld Information Has Been Previously Disclosed or is
Otherwise Known to the Public .................................................................29

CONCLUSION.........................................................................................................30

# Table of Authorities

**CASE**                                                                                                    **PAGE NO.**

*Adamowicz v. IRS.*, 552 F. Supp. 2d 355 (S.D.N.Y. 2008) ..........................................8

*Allard K. Lowenstein Intern. Human Rights Project v. Dep't of Homeland Sec.*,
626 F.3d 678 (2d Cir. 2010)...............................................................................25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................8

*Bagwell v. U.S. Dep't of Justice*, No. 15-cv-00531, 2015 WL 9272836
(D.D.C. Dec. 18, 2015) ....................................................................................14

*Banks v. U.S. Dep't of Just.*, 700 F. Supp. 2d 9 (D.D.C. 2010)..................................15

*Blackwell v. F.B.I.*, 646 F.3d 37 (D.C. Cir. 2011) .................................................25, 26

*Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*,
377 F. Supp. 3d 428 (S.D.N.Y. 2019)................................................................16

*Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Immigr. & Customs Enf't*,
No. 21-cv-2443, 2021 WL 5562558 (S.D.N.Y. Nov. 29, 2021).....................16, 17, 18

*Brennan Ctr. for Just. v. Dep't of Just.*, 697 F.3d 184 (2d Cir. 2012).............22, 23, 24

*Campbell v. Dep't of Just.*, 164 F.3d 20 (D.C. Cir. 1998) ...........................................15

*Carney v. U.S. Dep't of Justice*, 19 F.3d 807 (2d Cir. 1994) ........................................8

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980).......23, 24

*Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1 (2001) ..........20

*DeBrew v. Atwood*, 792 F.3d 118 (D.C. Cir. 2015)......................................................8

*Det. Watch Network v. United States Immigr. & Customs Enf't*,
215 F. Supp. 3d 256 (S.D.N.Y. 2016)...............................................................28

*Families for Freedom v. C.B.P.*, 837 F. Supp. 2d 287 (S.D.N.Y. 2011) .....................28

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999)...........................8, 20

*Immigrant Def. Project v. U.S. Immigr. & Customs Enf't*,
208 F. Supp. 3d 520 (S.D.N.Y. 2016)...............................................................16

*Jud. Watch v. U.S. Postal Serv.*, 297 F. Supp. 2d 252 (D.D.C. 2004) .........................23

*Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention*, No. 20 CIV. 2761 (AT), 2021 WL 4253299 (S.D.N.Y. Sept. 17, 2021) ...............................................................19, 21, 22

*Knight First Amend. Inst. at Columbia Univ. v. United States Citizenship & Immigr. Servs.*, 30 F.4th 318 (2d Cir. 2022).........................................27

*Lamont v. Dep't of Justice*, 475 F. Supp. 761 (S.D.N.Y. 1979) .................................30

*N.Y. Times Co. v. CIA*, 314 F. Supp. 3d 519 (S.D.N.Y. 2018) .......................................9

*N.Y. Times v. Dep't of Justice*, 756 F.3d 100 (2d Cir. 2014).........................................28

*Nat'l Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350 (2d Cir. 2005).......20, 23

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 811 F. Supp. 2d 713 (S.D.N.Y. 2011)..................................................................21

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't.*, 486 F. Supp. 3d 669 (S.D.N.Y. 2020)..................................................................20

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 8 77 F. Supp. 2d 87 (S.D.N.Y. 2012) ....................................................................9

*Nat'l Immigr. Project of Nat'l Laws. Guild v. Immigr. & Customs Enf't*, No. 17-CV-02448 (APM), 2020 WL 5798429 (D.D.C. Sept. 29, 2020)...............27, 29

*NLRB v. Sears, Roebuck, & Co.*, 421 U.S. 132 (1975).................................................20

*Tax Analysts v. I.R.S.*, 117 F.3d 607 (D.C Cir. 1997).................................................23

*Tax Analysts v. I.R.S.*, 294 F.3d 71, 81 (D.C. Cir. 2002)............................................26

*U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991)........................................................7, 8

*United States v. Mejia*, 655 F.3d 126 (2d Cir. 2011)....................................................22

*Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999) .....................15

*Wood v. FBI*, 432 F.3d 78 (2d Cir. 2005) ....................................................................8

**STATUTES**

5 U.S.C. § 552 ..................................................................................*passim*

**RULES**

FED. R. CIV. P. 56(a) .......................................................................8

**Other Authorities**

H.R.Conf.Rep.No.93-1380, 93d Cong., 2d Sess. (1974) .............................30

Nina Bernstein, "U.S. Immigrant raids went for many nonfugitives,"
*N.Y. Times* (Feb. 4, 2009) ...............................................................28

Felipe de la Hoz, Documented, *The ICE Ruse: How Agents
Impersonate Local Law Enforcement and Lie to Make Arrests* (June 18, 2018) ...........6

Caitlin Dickerson and Zolan Kanno-Youngs, *Border Patrol Will Deploy
Elite Tactical Agents to Sanctuary Cities*, N.Y. Times (Feb. 14, 2020)................*passim*

Caitlin Dickerson, Zolan Kanno-Youngs and Annie Correal,
*'Flood the Streets': ICE Targets Sanctuary Cities With Increased Surveillance*,
N.Y. Times (March 5, 2020)...............................................................*passim*

U.S. Department of Justice, Office of Justice Programs, *Federal Law
Enforcement Officers, 2016 – Statistical Tables* (Oct. 2019) .....................11

U.S. Department of Justice, Office of Justice Programs, *Federal Law
Enforcement Officers, 2016 – Statistical Tables* (Oct. 2019) .....................11

<u>**PRELIMINARY STATEMENT**</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs the Immigrant Defense Project ("IDP") and Center for Constitutional Rights ("CCR") (collectively, "Plaintiffs") hereby move this Court for an order denying the Motion for Summary Judgment submitted by the United States Department of Homeland Security ("DHS") and United States Immigration and Customs Enforcement ("ICE") (collectively, "Defendants"), and granting Plaintiffs' Cross Motion for Summary Judgment (hereinafter, the "Cross-Motion").

For two principal reasons, Defendants DHS and ICE have failed to meet the burden for summary judgment and continue to obscure Operation Palladium. First, DHS and ICE's searches were inadequate. Defendant DHS searched no agency or component other than ICE, and Defendant ICE itself failed to search several sub-agencies and components likely to have responsive records, used inconsistent search terms without a reasonable basis, and improperly withheld documents known to be in its possession. Second, ICE's claimed exemptions from disclosure under the Freedom of Information Act ("FOIA") are unjustified. With respect to Exemption 5, ICE frequently invoked the deliberative process privilege to protect information that is neither predecisional nor deliberative and failed to demonstrate that certain withheld information is protected by the attorney-client privilege. ICE's invocations of Exemption 7(E) failed to articulate a legitimate risk to security in revealing staffing information already disclosed. Lastly, ICE uses Exemptions 6 and 7(C) in error to conceal the domain names of email addresses of law enforcement agencies.

This Court should compel ICE to disclose the withheld portions of the requested records and search certain offices and custodians for records that shed light on Operation Palladium.

I.    **DHS and ICE Plan Surge Operations Relating to Palladium and Give Interviews to** *New York Times*

In 2020, officials for the Trump Administration (hereinafter, "Administration") leaked to *The New York Times* (hereinafter, "NYT" or "*The Times*") information about an interior immigration enforcement "surge" initiative relating to what it named "Operation Palladium."[1] *The Times* articles included interviews from leadership of U.S. Customs and Border Protection ("CBP"), including then-acting head of CBP Mark Morgan, chief patrol agent for Border Patrol Tactical Unit ("BORTAC") Tim Sullivan, and CBP spokesman Lawrence Payne. *The Times* articles also reference internal emails from within CBP and DHS relating to Operation Palladium.

In its leaked information to *The Times*, the Administration included several notable features about the surge operations relating to Operation Palladium that appear to distinguish it from ICE's routine operations. These features include, for example:

- Number of agents assigned to participate;

- The scale of arrests that assigned agents were presumably aiming to conduct within a limited period of time;

- Types of DHS components and sub-agencies that allocated and assigned staff and resources to Palladium. In particular, that specific squads of CBP agents from the

---

[1] *See, e.g.*, Bates Nos. 868 (listing certain cities as "OP surge cites"), 305-308 (using term "Palladium Surge"), 506-508 (writing, "using HSI and CBP agents as surge force") at Wachtenheim Decl. Ex. 1. *See also* Caitlin Dickerson and Zolan Kanno-Youngs, *Border Patrol Will Deploy Elite Tactical Agents to Sanctuary Cities*, N.Y. Times (Feb. 14, 2020), *available at* https://tinyurl.com/4tma6v35 (last visited May 2, 2022) (hereinafter, "Dickerson, *Border Patrol Will Deploy*") and Caitlin Dickerson, Zolan Kanno-Youngs and Annie Correal, *'Flood the Streets': ICE Targets Sanctuary Cities With Increased Surveillance*, N.Y. Times (March 5, 2020), *available at* https://www.nytimes.com/2020/03/05/us/ICE-BORTAC-sanctuary-cities.html (last visited May 2, 2022) (hereinafter, "*Flood the Streets*").

Border Patrol Tactical Unit (known as "BORTAC")[2] would have a substantial presence in interior enforcement operations that are ordinarily within the purview of ICE;

- Potential presence of military-grade equipment in urban centers;

- Number of hours per day committed to surveillance of individuals at their homes and workplaces, and the required person-power and technological support for such a surveillance operation;

- An enforcement operation that was developed overtly and specifically to target certain locations due to state and local legislation and regulations that places information-sharing limitations on local and state actors, including protecting against the sharing of personal information and against custodial transfer to federal agents who do not possess judicial warrants.

*See* Dickerson *et al.*, *'Flood the Streets'*; Dickerson & Correal, *Border Patrol Will Deploy*.

These announcements of the surge operations relating to Palladium provoked serious concern from elected officials. For example, members of the United States House of Representatives, led by Congressmembers from Massachusetts, Illinois, Michigan, and New York, wrote public letters to CBP and DHS leadership requesting information, and voicing their outrage at the plan : "BORTAC officers are heavily armed and receive training for high-risk military operations that mirror aspects of the U.S. Special Operations Forces," and their "highly militarized training raises serious questions and concerns about their capacity to engage in community-based

---

[2] *The Times* describes BORTAC as "immigration SWAT teams that are normally assigned to risky border smuggling, rescue and intelligence operations." Dickerson, *'Flood the Streets'*. "An elite tactical unit," features of BORTAC include "additional gear such as stun grenades and enhanced Special Forces-type training, including sniper certification." Dickerson, *Border Patrol Will Deploy*.

settings."[3] These Congressmembers pointed to concerns over "injuries and even casualties given BORTAC's inexperience managing community-based scenarios" and "use of excessive force by federal officers enforcing the immigration laws." *Id.*

## II. *New York Times* Contacts Plaintiff IDP About DHS Surge Operation Announcements and Operation Palladium

*The Times* contacted Plaintiff IDP's then-Deputy Director, Mizue Aizeki, with questions about deployment of BORTAC agents in New York City, and about the surveillance, enforcement, and arrest activities that DHS, CBP, and ICE had described as features of Operation Palladium and the surge operations.[4] This was a time of escalated ICE presence in New York City.[5] Around that time, IDP had received reports of ICE agents armed with rifles in residential buildings in New York City during immigration interior enforcement operations, as well as at least two reports of CBP presence.[6] In New York City, an ICE agent had recently shot a community member in the face during an arrest operation.[7]

After *The Times* published its story on Operation Palladium, other news outlets soon picked up the story, but none with more information than what *The Times* had reported.[8] To this day,

---

[3] *See* Letter from Congress of the United States to Acting Secretary of U.S. Department of Homeland Security and Acting Commissioner of U.S. Customs and Border Protection (Feb. 15, 2020), *available at* https://pressley.house.gov/sites/pressley.house.gov/files/BORTAC%20DEPLOYMENT%20LETTER%2002.15.2020.pdf (last visited May 1, 2022) (hereinafter, "Letter from Congress").

[4] *See* Declaration of Mizue Aizeki ¶ 12 (hereinafter, "Aizeki Decl.").

[5] *See* IDP, *ICE Raids*, *available at* https://www.immigrantdefenseproject.org/raids/ (last visited Apr. 29, 2022) ("Starting in January 2020, ICE increased its ICE raids activity in the NYC area. IDP received reports of 143 ICE raids in the first 11 weeks of 2020, over 400% more than the last 11 weeks of 2019.").

[6] *See* IDP and CCR, ICEwatch, *available at* https://raidsmap.immdefense.org/ (last visited Apr. 29, 2022).

[7] *See* Dickerson, *'Flood the Streets'*.

[8] *See, e.g.*, Alexandra Kelley, The Hill, *ICE officers deployed to 'flood the streets' of sanctuary cities: report* (Mar. 5, 2020), *available at* https://thehill.com/changing-

outside of what has been produced by Defendants in this FOIA lawsuit, Plaintiffs are not aware of DHS or its sub-agencies releasing or providing the public with *any* further information about the surge operations relating to Operation Palladium.

## III.    Plaintiffs File FOIA Request.

Plaintiffs filed a FOIA request with DHS and ICE on June 17, 2020, seeking records relating to ICE and DHS surveillance and surge operations relating to Operation Palladium. Dkt. No. 1-1. Defendants ICE and DHS failed to produce any responsive records within the statutory timeframe, prompting Plaintiffs to file the instant lawsuit on December 16, 2020. Dkt. No. 1. Since an initial appearance before this Court on March 5, 2021, Defendant ICE, has produced a total of 1274 pages of documents, *see* Declaration of Lynnea Schurkamp dated March 28, 2022 ("ICE FOIA Decl.") ¶ 38, the vast majority of which were heavily redacted. Relying on 5 U.S.C. § 552(a)(4)(B), Defendant ICE invoked Exemptions 5, 6, 7(C), and (7)(E) to conceal policies, records, internal communications, despite having used the media to broadcast chosen messaging around Operation Palladium, and operation that instilled fear in immigrant communities and affected the public more broadly. Defendant ICE also withheld over 1000 pages of documents. *See* ICE FOIA Decl. ¶ 38.

Other than ICE, no agency, sub-agency, or component of DHS conducted any search for records. *Cf. generally* ICE FOIA Decl.

## IV.    Information Related to DHS Surge Operations and Operation Palladium is Essential to Plaintiffs' Advocacy and Community Education Efforts.

This information is crucial to Plaintiffs' efforts to educate the public and change policy. Plaintiffs are regularly contacted by elected officials, journalists, and community leaders asking

america/resilience/refugees/486129-ice-deploying-hundreds-of-additional-officers-to/ (last visited May 1, 2022).

for information and analysis on the nature of federal immigration surveillance and enforcement nationally and within New York City and New York State specifically, including since the coverage of Operation Palladium in *The Times*,. *See* Aizeki Decl. ¶ 9. The increased presence of ICE agents in communities in the past decade has caused significant fear and confusion—in particular because ICE often presents themselves simply as "police."[9]

The limited information Plaintiffs have already obtained through this FOIA litigation has shown that DHS and sub-agencies and components planned an expansive, cross-agency immigration enforcement surge operation in the interior of the United States, which eventually was named Operation Palladium. This information has further confirmed the participation of CBP and BORTAC, and suggests DHS communications with the New York Police Department. *See, e.g.*, Bates Nos. 833-834, 468-488, 941 (reflecting CBP and Border Patrol staffing) at Wachtenheim Decl. Ex. 2; Bates Nos. 207-208 (ICE Field Operations Worksheet reflecting the NYPD precinct to be notified), at Wachtenheim Decl. Ex. 4.

Plaintiffs continue to provide publicly available, free Know Your Rights information and documents about federal immigration enforcement activities on a regular basis. *See* IDP, Know Your Rights With ICE, *available at* www.immigrantdefenseproject.org/know-your-rights-with-ice/ (last visited Apr. 25, 2022) (providing posters, booklets, community resource tools regarding interactions with federal immigration agents in homes, workplaces, cars, and on the street); Aizeki Decl. ¶ 8.

---

[9] *See* Felipe de la Hoz, Documented, *The ICE Ruse: How Agents Impersonate Local Law Enforcement and Lie to Make Arrests* (June 18, 2018), *available at* https://tinyurl.com/ywmpd6ve (last visited Apr. 29, 2022). *See also* Letter from Congress ("Deploying additional officers with even more arms and tactical training will only raise the already heightened sense of fear and anxiety in our immigrant communities.").

However, the information hidden by DHS and ICE's redactions and inadequate searches hinders the Plaintiffs' ability to fully advocate and educate the public on Palladium and related DHS operations that may have followed. There is no indication that DHS has abandoned potential interior enforcement surge operations like Operation Palladium—i.e., operations involving significantly more agents and personnel than normal; protracted surveillance of homes, workplaces, and community spaces; deployment of CBP and BORTAC agents to support ICE Enforcement and Removal Operations ("ERO") for interior surveillance and arrest operations; and arrest quotas. Yet years after DHS conceived and implemented surge initiatives such as Operation Palladium, only sparse information about it has been made available to the public. The universe of unknown information is vast, including: the number of armed federal immigration agents DHS may deploy in U.S. cities; when and whether DHS may deploy large military equipment in U.S. cities for immigration enforcement; when and whether DHS will make collateral arrests during mass surveillance and arrest operations; and DHS's willingness to authorize mass arrests and surveillance as a retaliatory measure in locations where it disagrees with state and local laws and policies.

The public, and state and local governments have a right to know about such measures that involve a significant federal police presence—and potentially local law enforcement resources—in their communities. Moreover, DHS can implement similar operations in the future. Information about these policies and practices will allow the public to protect their rights and to engage in an ongoing, critical, and pressing public dialogue about U.S. immigration policies and policing practices, including the use of large-scale surveillance and arrest operations that retaliate specifically against certain localities and States.

# ARGUMENT

## I.      Standard of Review

The central purpose of FOIA is to "promote honest and open government." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999).  The statute was designed "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (internal citation omitted). Accordingly, FOIA's "strong presumption in favor of disclosure" places the burden on the defending agency to justify its searches and redactions and to show that withheld information falls within the claimed exemptions. *Ray*, 502 U.S. at 173; 5 U.S.C. § 552 (a)(4)(B).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court must draw all reasonable inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is the process generally used to resolve FOIA claims. *Adamowicz v. IRS.*, 552 F. Supp. 2d 355, 360 (S.D.N.Y. 2008). To satisfy this summary judgment burden, agencies must submit affidavits that are "detailed, nonconclusory and submitted in good faith." *Wood v. FBI*, 432 F.3d 78, 85 (2d Cir. 2005) (internal citation omitted).

The agency bears the burden of demonstrating that it conducted an adequate search for records responsive to the FOIA request and that any withheld material is exempt from disclosure. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). To satisfy this burden, the agency must show "beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents." *DeBrew v. Atwood*, 792 F.3d 118, 122 (D.C. Cir. 2015) (internal citations omitted). To justify decisions to withhold responsive records, an agency must provide "reasonably detailed explanations why any withheld documents fall within an exemption." *Id.*

Agency affidavits must describe with reasonable specificity the nature of the documents at issue and the justification for nondisclosure, as "conclusory assertions are insufficient." *N.Y. Times Co. v. CIA*, 314 F. Supp. 3d 519, 525 (S.D.N.Y. 2018).

## II. Defendant Failed to Conduct an Adequate Search for Relevant Records.

Summary judgment should not be granted in favor of the agency "where the agency's response raises serious doubts as to the completeness of the agency's search, where the agency's response is patently incomplete, or where the agency's response is for some other reason unsatisfactory." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 877 F. Supp. 2d 87, 96 (S.D.N.Y. 2012) (internal citation omitted). Under this standard, Defendants' search is woefully inadequate, missing some of the most relevant agency custodians and offices entirely, while also employing haphazard and overly narrow search terms and methods. Plaintiffs therefore request that the Court order Defendants to conduct a more robust supplemental search that includes additional agencies and offices within DHS, including DHS Headquarters, U.S. Customs and Border Protection, the DHS Office of Intelligence and Analysis, the ICE Office of Public Affairs, and the ICE Office of Public Relations and Engagement. Additionally, Plaintiffs request that Defendants use additional search terms that are clearly likely to yield responsive material, and to adequately follow clues uncovered through their searches, which Defendants plainly have not yet done.

### a. Defendants Did Not Search Custodian Agencies Clearly Within the Scope of Plaintiffs' FOIA Request and Did Not Justify This Failure to Search.

Defendants' search was inadequate because they did not search custodians likely to have responsive records. Nor have Defendants justified their failure to do so. Both the February and March 2020 articles in *The Times* as well as documents produced to Plaintiffs by Defendants make clear DHS and its sub-agencies and components other than ICE were involved and should have

been searched. Plaintiffs respectfully request the Court order Defendants to conduct supplemental searches of additional custodian agencies.

In their summary judgment motion and ICE FOIA Officer Declaration, Defendants make plain that only Defendant ICE conducted any search in response to the FOIA request, and that the only agencies within ICE to do so were ICE Enforcement and Removal Operations ("ERO") and ICE Homeland Security Investigations ("HSI"), only two of ICE's sub-agencies and of the dozens of other sub-agencies and components within DHS. It is further notable that ERO and HSI did not search all relevant sub-components. The only attempt at an explanation for this limited search is that ICE determined that "Operation Palladium was an ERO-led initiative in concept and execution." ICE FOIA Decl. ¶ 19.

This is plainly inadequate under FOIA. At a minimum, it is entirely unreasonable for DHS to refuse to search its Headquarters (for example, Office of the Secretary or Deputy Secretary of Homeland Security), CBP and its components, and other DHS sub-agencies and components, given that CBP leadership publicly stated that participation of CBP and other components of DHS are a defining feature of Operation Palladium. *See* Dickerson, *Border Patrol Will Deploy* ("Lawrence Payne, a spokesman for Customs and Border Protection, confirmed that the agency was deploying 100 officers to work with ICE."). It is further unreasonable to expect that ICE—a sub-agency of DHS—would itself have all of the responsive documents and information about the other agencies (like CBP) with which it was collaborating for the surge operations relating to Palladium.

      **1. Defendant DHS Should Have Searched Several Agencies Very Likely to Be Related to Operation Palladium, and Instead Searched Only One Out of Dozens.**

Plaintiffs submitted the FOIA request directly to DHS and requested specifically that DHS forward the request to any agencies, officers, or employees who might have responsive records. *See* Dkt. No. 1-1 ("We ask that you please direct this request to all appropriate offices and departments within each agency."). Yet Defendants' summary judgment motion makes it apparent that DHS conducted no search whatsoever of its Headquarters, or any of the agencies or offices within DHS except for co-Defendant ICE which is a sub-agency of DHS. *See* Dkt. No. 47 at pp. 5-10; *see also* ICE FOIA Decl., ¶ 19, ("After reviewing the FOIA Request, the ICE FOIA Office determined that because of the subject matter . . .  ICE's Enforcement and Removal Operations (ERO) directorate was likely to have responsive records. More specifically, Operation Palladium was an ERO-led initiative in concept and execution."). For several reasons, this was inadequate.

First, DHS is the largest law enforcement agency in the United States.[10] DHS contains dozens of agencies. For example, U.S. Customs and Border Protection; the Office of Strategy, Policy, and Plans; the Federal Law Enforcement Training Centers; the Office of Operations Coordination; and the Office of Intelligence and Analysis.[11] U.S. Customs and Border Protection itself contains, for example, the U.S. Border Patrol, the Office of Facilities and Asset Management and the Office of Training and Development.[12] Yet Defendants searched none of

---

[10] *See* U.S. Department of Justice, Office of Justice Programs, *Federal Law Enforcement Officers, 2016 – Statistical Tables* (Oct. 2019), *available at* https://www.dhs.gov/office-state-and-local-law-enforcement (last visited Apr. 28, 2022).

[11] *See* DHS Public Organizational Chart 2021.04.02, *available* at https://www.dhs.gov/sites/default/files/publications/21_0402_dhs-organizational-chart.pdf (last visited Apr. 25, 2022).

[12] *See* U.S. Customs and Border Protection Public Organizational Chart 10.25.2017, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2017-Oct/US-CBP-org-charts-10.25.17.pdf (last visited Apr. 25, 2022).

these additional sub-agencies and components, instead delegating the full scope of searching to ICE-ERO and ICE-HSI.

Second, in speaking with *The Times*, DHS was overt that Operation Palladium was a cross-agency operation, and specifically that it would involve CBP resources. In fact, this information was provided to *The Times* directly by then-acting head of CBP Mark Morgan and chief patrol agent for BORTAC Tim Sullivan, and CBP spokesman Lawrence Payne.[13] It is entirely unreasonable that DHS now views itself and CBP as irrelevant to questions about Operation Palladium.

Third, the documents that ICE has turned over to Plaintiffs confirm the participation of other agencies, though are otherwise woefully insufficient. For example, there are multiple references to CBP agents and teams, including staffing manifests that show CBP agents on interior enforcement teams with ICE-ERO and ICE-HSI. *See, e.g.*, Bates Nos. 833-834, 468-488, 941 at Wachtenheim Decl. Ex. 2. As another example, there is a nearly completely redacted staffing manifest that nonetheless lists acronyms/initialisms for the sub-agencies detailed to Operation Palladium, yet Defendants have not told Plaintiffs what the full names of those agencies are, or followed these obvious clues to search for more documents relating to this cross-agency collaboration for the surge operations around Operation Palladium. *See, e.g.*, Bates No. 491-493 at Wachtenheim Decl. Ex. 4. It was unreasonable for DHS not to submit the FOIA request to the FOIA offices of its sub-agencies like CBP (as just one example), and not to search its own Headquarters, given that cross-agency collaboration and planning was an apparent cornerstone of Operation Palladium.

---

[13] *See* Dickerson, *'Flood the Streets'*; *see also* Dickerson, *Border Patrol Will Deploy*.

## 2. Defendant ICE Also Failed to Search Adequate Custodians and Should Have Searched Additional Agencies and Offices.

ICE did not search sub-agencies very likely to have responsive records. Operation Palladium was large-scale, and involved collateral arrests, lists of "targets," and involved mass surveillance. It is unreasonable, for example, that ICE would think ERO-Operations Support—which it did not search—would not have any responsive material regarding a cross-agency operation as large as Palladium. It is also unreasonable that the Principal Legal Advisor would have no segregable information whatsoever regarding Palladium, including trainings or planning for trainings. This is particularly true given that, according to documents produced by ICE, all staff assigned to Palladium were required to attend legal training. *See* Bates No. 491 at Wachtenheim Decl. Ex. 4.

It is particularly unreasonable and concerning that ICE did not search its Public Affairs office. Plaintiffs' request specifically asked for communications relating to Operation Palladium. *See* Dkt. 1-1. The request discussed, at length, the media's coverage of Operation Palladium and similar incidences of CBP presence in U.S. cities. It is evident that Public Affairs had at least some responsive records and thus it was required for ICE to follow that clue and conduct a search.[14]

There is ample basis in case law to demonstrate why ICE's failure to search additional custodians demonstrates the inadequacy of its search.

## 3. Defendants Failed to Uncover Material Known to Be in Their Possession.

---

[14] *Cf. See* Dickerson, *'Flood the Streets'* (discussing interviews with CBP leadership about Palladium); *see also* Dickerson, *Border Patrol Will Deploy*.

DHS and ICE failed to uncover material known to be in their possession, which "raises a legitimate question as to thoroughness of the search." *See Bagwell v. U.S. Dep't of Justice*, No. 15-cv-00531, 2015 WL 9272836, at *2 (D.D.C. Dec. 18, 2015) (finding doubt as to the adequacy of a search where it failed to uncover a record of communication alluded to in public). The following are examples of documents Plaintiffs know to be in Defendants' possession that have not been released in this litigation:

**Table 1: Documents and Materials Known to Be in Defendants' Possession.**

| Examples of Documents and Materials Known to Be in Defendants' Possession. | Bates Nos. (Or Other Source Information). |
|---|---|
| Emails within and between DHS, ICE, and CBP regarding CBP and other DHS sub-agency and components participating in Operation Palladium through staffing or equipment. | *See* Dickerson, *'Flood the Streets.'* |
| Communications between DHS or ICE and CBP. | *See, e.g.*, Bates No. 207-208 (ICE Field Operations Worksheet reflecting the NYPD precinct to be notified), at Wachtenheim Decl. Ex. 3. |
| "Taskings" for ICE ERO and other ICE and DHS sub-agencies for Operation Palladium. In prior FOIA Requests, Defendants have provided "Taskings" to requestors. | *See, e.g.*, Wachtenheim Decl. Ex. 5 (E-mail from DHS or ICE email account "ERO Taskings" sent in relation to Operation Mega in 2017). |
| Several versions of the Operation Palladium Operations Plans. | *See, e.g.*, Bates Nos. 502-508 (referencing email attachments that were never provided to Plaintiffs), Wachtenheim Decl. Ex. 6. |
| "Team and LEA breakdown" for New York Field Office. | *See* BatesS No. 122 ("See attached Excel spreadsheet for Team and LEA breakdown."), Wachtenheim Decl. Ex. 7. |
| Target lists for New York City Field Office. | *See*, e.g., Bates Nos. 612-613 (attaching target lists for Newark Field Office but not New York City), Wachtenheim Decl. Ex. 8. |
| Information about arrest quotas. | *See* Dickerson, *'Border Patrol Will Deploy'* ("The goal of the new joint operation, one of the officials said, was to increase arrests in the |

| | sanctuary jurisdictions by at least 35%."). *See also, e.g.*, Bates No. 7037 Wachtenheim Decl. Ex. 9, DHS emails released through "Operation Mega" FOIA litigation ("Each field office is responsible for the below number of targets"). |
| --- | --- |

### 4. Defendants Did Not Follow Obvious Leads.

What Defendants did produce demonstrates that additional sub-agencies and components were very likely to possess relevant material. For an agency's search to be adequate, it must "follow through on obvious leads to discover requested documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (finding a search inadequate where an agency failed to search an office identified as potentially containing responsive records and an individual with a close nexus to the record requested). This follow-through includes accounting for "leads that emerge during [an agency's] inquiry." *Campbell v. Dep't of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998) (holding that the district court erred in finding FBI's search adequate when FBI failed to search for potentially responsive records alluded to in other records the FBI produced). Defendants DHS and ICE failed to follow up on obvious leads obtained through its search process, which indicated that several other sub-agencies within DHS were related to Palladium. *See infra* Table 2, Terms Searched, Examples of Terms Excluded from Search. To that end, Defendants had the responsibility to specifically search additional sub-agencies and components. Their failure to do so demonstrates that their search was inadequate.

### 5. ICE Has Not Provided a Reasonable Explanation for Why It Did Not Search These Custodians.

Defendants have not provided a reasonable explanation for why they did not search these custodians. Agencies may not unreasonably limit the offices and custodians searched without explanation. *Banks v. U.S. Dep't of Just.*, 700 F. Supp. 2d 9, 15 (D.D.C. 2010) (finding a search

inadequate where the defendants failed to explain why they included some custodians and excluded others). Defendant DHS fails to provide any information whatsoever about why it searched no subordinate agency other than ICE. Defendant ICE fails to provide any explanation for why its FOIA Office identified ERO and HSI as the only offices likely to possess responsive records. ICE's declaration contains just one hint regarding its choice of custodians, a statement that ICE's FOIA office identified Palladium as an "ERO-led initiative in concept and execution." ICE FOIA Decl., ¶ 19, Dkt. No. 46 ("After reviewing the FOIA Request, the ICE FOIA Office determined that because of the subject matter . . . ICE's Enforcement and Removal Operations (ERO) directorate was likely to have responsive records. More specifically, Operation Palladium was an ERO-led initiative in concept and execution."). But such a conclusory statement, without further explanation, is not enough to prove the adequacy of the search. *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Immigr. & Customs Enf't*, No. 21-cv-2443, 2021 WL 5562558, at * 5 (S.D.N.Y. Nov. 29, 2021). That a multi-agency operation of vast proportion is led by an agency does not mean that other agencies will not have responsive records. These failures demonstrate the inadequacy of Defendants' search and underscore Plaintiffs' request, *infra*, that the Court compel Defendants to conduct supplemental searches of key offices and custodians.

### b. Defendants' Selection of Search Terms and File Systems Varied Widely and Without Any Rational Basis, and the Agency Failed to Include Clearly Relevant Key Terms.

An agency's search can also be deemed inadequate when it fails to explain unreasonable differences between search terms across offices, *see Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*, 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019), or when an agency fails to explain why clearly relevant search terms were not used, *Immigrant Def. Project v. U.S. Immigr. & Customs Enf't*, 208 F. Supp. 3d 520, 528 (S.D.N.Y. 2016). Additionally, agencies cannot fail to

use obvious terms, acronyms or spelling variations in their searches, or fail to explain discrepancies between the systems each office searched. *Brennan Ctr. for Just.*, 2021 WL 5562558, at *5 (holding that a search was improper where the defendant failed to explain why some ICE divisions searched shared drives while others did not).

Defendants' search for responsive records was inadequate under this standard. Defendants used a haphazard and inconsistent approach to their search terms and methods because they failed to give standardized instructions when delegating to internal offices, resulting in widely divergent terms and an inconsistent search of file systems across different units; used unlikely plural and compound words; and excluded obviously relevant terms that were clearly identified as central to the request.

**Table 2: Terms Searched, Examples of Terms Excluded From Search**

| Terms Defendants Searched | Agents/Agencies That Searched Each Term | Terms and Clues Plaintiffs Identified as Recurring in Production and/or Obvious Terms to Search in Response to Plaintiffs' Request, That Defendants Did Not Search |
|---|---|---|
| "Operation Palladium" "Use of Ruses in Enforcement Operations" "surveillance tactics" "TRSS" "Thompson Reuters" "CLEAR" "Palladium" | ICE-ERO-CAP <br> ● 1 hour | "Op Palladium" "Rolling Ops/Palladium" "Palladium/Rolling Ops" "Rolling Operations" "OP PALLADIUM" "OP Palladium" "ERO Surge" "Cross Check" "HHS surge op" "OP" "Operation SUB zERO" "BORTAC" "CBP" |
| "NYPD" "Palladium" | ICE-ERO-FOD <br> ● 2 hours | |
| "Palladium" | ICE-ERO-TOD-Director for the PERC <br> ● 1 hour | |

| | | |
|---|---|---|
| "Palladium" | ICE-ERO-TOD-NCATC Director | "NYPD"<br>"Border Patrol"<br>"50/50 CBP Assist"<br>"50/50 CBP"<br>"ruse"<br>"Fourth Amendment"<br>"training"<br>"target list"<br>"flood"<br>"sanctuary city"<br>"sanctuary cities"<br>"surge sites"<br>"surge" |
| "Palladium" | ICE-EROTD | |
| "Palladium" | ICE-Headquarters-ERO Field Operations | |
| "Operation Palladium"<br>"Palladium" | ICE-ERO-NYC field office | |
| "Operation Palladium"<br>"Palladium" | ICE-ERO-NCATC | |
| "Palladium" | ICE-ERO-NFOP | |
| "surveillance"<br>"surveillance tactics" | ICE-HSI Policy Unit | |
| "surveillance"<br>"10029.2" | ICE-HSI Academy | |
| "Operation Palladium"<br>"ERO"<br>physical/digital case files | ICE-HSI SAC Offices | |

For example, only one individual out of nearly 200 used the search term "NYPD" or searched for anything having to do with the NYPD. Only HSI searched for the term "surveillance," ERO did not. *Cf. Brennan Ctr. for Just.*, 2021 WL 5562558, at *5 (finding that ICE's search was inadequate where some divisions failed to use what other divisions deemed clearly relevant search terms, including basic phrases like "training" or "guideline" when the FOIA request called for "training materials" and any materials that "guide" agents in implementing the handbooks). The ICE FOIA declaration also fails to explain whether certain words were searched in both their singular and plural form, if other acronyms or spellings were used, and if these terms were searched together through Boolean connectors, all of which are required to establish an adequate search.

*See Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention*, No. 20 CIV. 2761 (AT), 2021 WL 4253299, at *6-7 (S.D.N.Y. Sept. 17, 2021).

Additionally, Defendants did not search for documents related to the Operation Palladium before the operation was given that specific name, even though there was significant planning, resource allocation, and communication about what would eventually be named Operation Palladium months before that name was assigned. Defendants also failed to follow up on clear leads regarding other DHS surge enforcement operations that were happening around the same time as and related to Operation Palladium. For example, documents that ERO and HSI produced contain numerous references to Operation Cross-Check, *see, e.g.*, Bates No. 489, 757, 788 at Wachtenheim Decl. Ex. 10, yet the FOIA Officer did not follow that clue and then search for documents regarding Cross-Check. The same is true for references to Rolling Ops, ERO Surge, and SUB–zERO, all of which are referred to in documents that ERO and HSI produced. *See, e.g.*, Bates No. 468 at Wachtenheim Decl. Ex. 2 ("SUB zERO Weekly Report); Bates Nos. 506 ("rolling ops") and 305 ("ERO surge") at Wachtenehim Decl. Ex. 1. Yet the FOIA Office never instructed the sub-agencies to search for those terms or similar terms.

Defendants also did not use any search terms that would likely yield information or documents relating to any of the following features that DHS itself touted as unusual to Operation Palladium: long hours of surveillance, use of unmarked cars during surveillance, or collateral arrests.[15] Plaintiffs identified these as items of interest in the Request, and DHS itself leaked these features to *The Times*. Nor did Defendants search anything related to use, transfer, loan, or

---

[15] *Compare generally* ICE FOIA Decl. *with* Dickerson, *'Flood the Streets'* (an "aggressive surveillance campaign, which involves closely watching some individuals for more than 12 hours a day;" "officers assigned to the latest operations are working longer hours, and for longer stretches of time, often 10 days in a row rather than the usual five").

procurement of surveillance or other equipment, despite Defendants discussing use of CBP elite

tactical personnel and around the clock surveillance operations in sanctuary cities with the press.[16]

Defendants' search is not reasonably calculated to uncover documents relevant to

Plaintiff's FOIA request about this multi-agency enforcement operation. ICE offers no sufficient

or reasonably explanation for why it failed to search using patently obvious search terms, and why

some of the terms it did use were only used in some searches and locations.

### III. Defendant Improperly Redacted and Withheld Information Under Exemption 5.

#### a. The Deliberative Process Privilege Does Not Apply to Emails Implementing Final Agency Policy.

Courts have repeatedly held that in actions under FOIA "disclosure, not secrecy, is the

dominant objective of the Act" *Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532

U.S. 1, 8 (2001) (internal citation omitted). The deliberative process privilege does not shield

"opinions and interpretations which embody the agency's effective law and policy" and permits

only the withholding of documents or communications that "reflect the agency's group thinking

in the process of working out its policy and determining what its law shall be." *Nat'l Day Laborer*

*Org. Network v. U.S. Immigr. & Customs Enf't.*, 486 F. Supp. 3d 669, 690 (S.D.N.Y. 2020)

(quoting *NLRB v. Sears, Roebuck, & Co.*, 421 U.S. 132, 153 (1975)). Pursuant to the deliberative

process privilege, "[a]n inter- or intra-agency document may be withheld . . . if it is: (1)

predecisional, i.e., prepared in order to assist an agency decisionmaker in arriving at his decision,

and (2) deliberative, i.e., actually. . . related to the process by which policies are formulated." *Nat'l*

*Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350, 356 (2d Cir. 2005) (internal quotation

marks and citations omitted). *See also Grand Cent. P'ship, Inc.*, 166 F.3d at 482 ("The privilege

---

[16] *See* Dickerson, *'Flood the Streets'*; Dickerson, *Border Patrol Will Deploy*.

protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."). The privilege does not protect postdecisional communications "transmitted to subordinates for application." *Knight First Amend. Inst.*, 2021 WL 4253299, at *13. ICE has mislabeled emails from high-level supervisors to employees as protected under the deliberative process privilege. These emails are not predecisional or deliberative; rather, they clarify, implement, or apply final decisions or policy. The most basic indicator of a record's predecisional nature is that it be "antecedent to the adoption of an agency policy." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 811 F. Supp. 2d 713, 742 (S.D.N.Y. 2011). But the redacted information in crucial emails does not precede the adoption of policy or contain any deliberative discussion, but merely articulates implementation of final policy to subordinates.

In the email entitled "Operation Palladium – HSI Special Agent in Charge (SAC) Assignments to ERO Field Offices," *see* Bates Nos. 194-95 attached at Wachtenheim Decl. Ex. 11, ICE has redacted the identities of seven ERO Field Offices known as "surge sites." *Vaughn* Index, ECF No. 46-1 at 5. Nowhere in the *Vaughn* index does ICE discuss how the identity of such "surge sites" is predecisional or subject to change. Such information reflects final agency policy and is not protected under the deliberative process privilege.

The *Vaughn* index further states that the number of "potential" SAC officers to be deployed in each team was "in flux" and "not certain" and that such information was therefore predecisional. Dkt. No. 46-1 at 5. But at some point HSI or its local offices must have made a final decision as to the numbers of agents to be deployed. If the redacted email at issue is indeed predecisional, a post-decisional agency communication with finalized numbers of agents has not yet been produced, and the agency is improperly withholding it or has not adequately searched for it. If no

additional email exists, then the information in Bates Nos. 194-95 must be considered the final policy regarding the number of agents to be deployed. If an agency "chooses expressly to adopt or incorporate by reference" a once-predecisional recommendation, that document is no longer "predecisional," and accordingly, it loses protection under Exemption 5. *Sears, Roebuck & Co.*, 421 U.S. at 161. Final numbers of agents deployed to each team in Operation Palladium cannot be protected by the deliberative process privilege.

Similar analysis applies to the email referred to as "ICE HSI Assistant Special Agent-in-Charge (ASAC) to numerous (more than twenty) ICE employees" (Bates Nos. 310-311). *See Vaughn* Index, Dkt. No. 46-1 at 6. The email, said to discuss "the methodology of how agents will be selected for upcoming operations" and providing instruction for agents to "get their cases up to date with statistics and program codes," *id.*, is neither predecisional nor deliberative, because it "transmit[s]" a final policy "to subordinates." *Knight First Amend. Inst.*, 2021 WL 4253299, at *13. It is not the kind of communication the deliberative process was intended to protect.

Finally, Plaintiffs do not seek information properly withheld from draft operations plans pursuant to the deliberative process privilege. Instead, as set forth below, Plaintiffs seek information improperly withheld from *final* operations plans pursuant to the attorney-client privilege.

> **b. The Attorney-Client Privilege Does Not Apply to the ERO Fugitive Operations Handbook, the Fourth Amendment Refresher Training for ERO Personnel, and Finalized Operations Plans.**

The attorney-client privilege "protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." *Brennan Ctr. for Just. v. U.S. Dep't of Just.*, 697 F.3d 184, 207 (2d Cir. 2012) (quoting *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011)).

However, the privilege does not allow an agency to withhold a document merely because it is a communication between the agency and its lawyers, and documents or opinions "routinely used by agency staff as guidance in conducting" their work are in effect working law that is not privileged. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 201 (D.C. Cir. 1980). "Like the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy." *Nat'l Council of La Raza*, 411 F.3d at 360.

Further, the attorney-client privilege cannot be invoked if communications between lawyer and client are not made confidentially or kept in confidence. *Brennan Ctr.*, 697 F.3d at 207. In other FOIA cases, ICE has released earlier versions of the ERO Fugitive Operations Handbook, the ERO Fourth Amendment Refresher Training Course, and finalized operations plans similar to those for Operation Palladium. *See* Wachtenheim Decl. Exs. 14, 15, 16. "[T]he agency must show that it supplied information to its lawyers with the expectation of secrecy and was not known by or disclosed to any third party." *Jud. Watch v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 267 (D.D.C. 2004). Given numerous releases of earlier iterations of similar or near-identical documents, it is clear that they were not created or distributed with the expectation of secrecy.

This is particularly so given that the information redacted from the Fugitive Operations Handbook, Fourth Amendment Refresher Training, and final operations plans amounted to finalized agency policy rather than tailored legal advice. The Handbook and Refresher Training are distributed to all agents and officers within ERO and clearly intended to communicate ICE's policies in the field. "A body of private law, applied routinely as the government's legal position" is not protected from disclosure to the public by the attorney-client privilege. *Tax Analysts v. I.R.S.,* 117 F.3d 607, 619 (D.C Cir. 1997). "[O]nce an agency adopts or incorporates

[a] document, frank communication will not be inhibited." *Brennan Ctr.*, 697 F.3d at 207. Withholding documents that "in practice represent interpretations of established policy on which the agency relies in discharging its regulatory responsibilities …would serve no legitimate policy interest of the government." *Coastal States Gas Corp.*, 617 F.2d at 869. Thus, guidance to field agents in the requirements and policies for preparing warrants or conducting ruses are in effect "agency law" that cannot be considered privileged attorney-client communication. *Brennan Ctr.*, 697 F.3d at 207.

Similarly, information redacted in finalized operations plans regarding how to treat juveniles or the criteria for identifying "gang members" or "gang associates" is properly understood as final agency policy. *See, e.g.,* Bates Nos. 124-125 at Wachtenheim Decl. Ex. 7. All of these represent final policies that communicate to officers not legal advice, but rather agency instructions for the proper conduct of operations and categorization of those arrested.

Finally, ICE argues that the Fourth Amendment Refresher Training is "expressly marked as Attorney Work Product" and therefore exempt from disclosure. Defs' Br. at 18. It is true that the version of the Refresher Training that was produced states that it is for review and "not for distribution." *See* Bates No. 1127 at Wachtenheim Decl. Ex. 13. But those markings alone do not entitle ICE to shield a final version of the Refresher Training under the work-product doctrine. Rather, to justify withholding, ICE must

> "(1) provide a description of the nature and contents of the withheld document, (2) identify the document's author or origin (by job title or otherwise), (3) describe the factual circumstances that surround the document's creation, and (4) provide some indication of the type of litigation for which the document's use is at least foreseeable."

*Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 21 F. Supp. 3d 60, 78 (D.D.C. 2014). None of this information appears in Defendants' *Vaughn* index or summary judgment motion. *See generally Vaughn* index. Dkt. No 46-1; *see also generally* Defs' Br. Dkt. No. 47.

To the extent that ICE is arguing that the document produced is a draft and therefore subject to the deliberative process privilege, Plaintiffs do not seek a *draft* document. But Plaintiffs note that no finalized version of the Refresher Training has been produced, and this version of the Refresher Training may indeed be the final version despite the notation that it is under review. If Ex. 13 represents the final form that the Refresher Training took, the document is protected neither by the attorney-client privilege nor the deliberative process privilege, and the withheld portions must be produced.

## IV. Defendant's Use of Exemption 7(E) is Overbroad and Does Not Justify Withholding of Training Materials, Manuals or Staffing Information.

In addition to claiming Exemption 5 to redact large portions of ICE's training materials and handbooks, as well as staffing numbers for operations, *see* Part III *supra*, Defendants also claim that such materials may be withheld under Exemption 7(E), which protects "techniques and procedures for law enforcement investigations and procedures" or information that "would disclose guidelines for law enforcement investigations and procedures if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. §552 (b)(7)(E). "The phrase 'techniques and procedures' . . . refers to how law enforcement go about investigating a crime," *Allard K. Lowenstein Intn'l Human Rights Project v. U.S. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010). In contrast, to show that "guidelines" are exempt from disclosure, the agency must "demonstrate logically how the release of such information might create a risk of circumvention of the law." *Blackwell v. F.B.I.*, 646 F.3d 37, 42 (D.C. Cir. 2011) (internal quotation

marks and citation omitted). To demonstrate that the redacted information can be shielded by Exemption 7(E), the government must provide:

> 1) a description of the technique or procedure at issue in each document, 2) a reasonably detailed explanation of the context in which the technique is used, 3) an exploration of why the technique or procedure is not generally known to the public, and 4) an assessment of the way(s) in which individuals could possibly circumvent the law if the information were disclosed.

*Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 246–47 (D.D.C. 2013). The *Vaughn* index for these documents does not meet this standard, and Defendants have not shown how the bulk of the information it has redacted falls under either "techniques and procedures" or "guidelines" which if disclosed could reasonably risk circumvention of the law.

> **a. Significant *Portions* of OPLA's Fourth Amendment Refresher Training, the ERO Fugitive Handbook & the HSI Surveillance Training Manual Contain Agency Policy and Working Law, Not Techniques and Procedures.**

Information that communicates rules of conduct or agency policy to employees does not fall under Exemption 7(E). Plaintiffs do not seek portions of these documents analogous to "forensic examination procedures," *Blackwell*, 647 F.3d at 42, or methods of "label[ing] cases or access[ing] databases." *Gonzalez v. U.S. Citizenship & Immigr. Serv.*, 475 F. Supp. 3d 334, 352 (S.D.N.Y. 2020). Instead, Plaintiffs seek information in these documents that instruct agents as to the rules of conduct, including the outer limits of lawful conduct, for conducting operations. This information is neither technical nor procedural, but rather a reflection of agency policy or working law. "Under the FOIA, 'working law' must be disclosed." *Tax Analysts v. I.R.S.,* 294 F.3d 71, 81 (D.C. Cir. 2002).

Plaintiffs know from prior productions of near-identical documents that the bulk of the redactions fall under the category of agency policy and agency law rather than techniques and

procedures. For example, as Plaintiffs have learned from release of documents in other cases, OPLA's Fourth Amendment Refresher Training contains information about the state of Fourth Amendment law for agents conducting operations. *See, e.g.*, Wachtenheim Decl. Ex. 14, (2014 Fourth Amendment Refresher Training disclosed in *Immigrant Def. Project v. ICE*, No. 14-cv-06117 (JPO) (filed Aug. 5, 2014). Summaries of the state of the law and proper conduct are properly categorized as agency policy or "working law," not technical information regarding how agents conduct investigations.

Similarly, productions of earlier versions of the ERO Fugitive Operations Handbook demonstrate that claims for exemptions under 7(E) here are improper. *See* Wachtenheim Decl. Ex. 15 (portions of ERO Fugitive Operations Handbook disclosed in *Nat'l Immigr. Project of Nat'l Laws. Guild v. Immigr. & Customs Enf't, No*. 17-CV-02448 (APM), 2020 WL 5798429 (D.D.C. Sept. 29, 2020). These pages contain agency law and policy for agents—not specific and technical guidelines that if learned by the public could lead to the circumvention of law. *Cf. Knight First Amend. Inst. at Columbia Univ. v. United States Citizenship & Immigr. Servs.,* 30 F.4th 318, 330 (2d Cir. 2022). Instead, the sections that are improperly redacted contain general agency law and policy. *See* Wachtenheim Decl. Ex. 16.

Given the over-redaction of the Refresher Training and the updated Fugitive Operations Manual, it is highly plausible that large portions of the redacted HSI Special Agent Surveillance Guide similarly reflect agency policy and working law rather than information about specific surveillance techniques or details about the functioning of databases. The little information released from that Guide supports Plaintiffs' contention. For example, at Bates No. 371, the HSI Guide contains a heading entitled "Enabling Performance Objectives" (EPOs), but the underlying text is completely redacted, save for a task identified as making a "Plan for a Surveillance

Activity." *See* Bates No. 373 at Wachtenheim Decl. Ex. 17. Performance objectives for ICE agents

have been disclosed in prior FOIA cases and revealed to the public for more than a decade.[17]

Disclosing the objectives that agency higher-ups have identified for agents to carry out have

revealed neither "techniques and procedures" nor guidelines that have led to "circumvention of the

law."

Plaintiffs respectfully request that these portions of these final policy documents be

disclosed, or in the alternative, submitted to the Court for *in camera* review.

### b. Staffing Plans Do Not Constitute "Techniques and Procedures for Law Enforcement Investigations" Shielded Under Exemption 7(E).

Defendants' *Vaughn* index claims that the release of the numbers of staff present in their

raids "would disclose law enforcement techniques or procedures, the disclosure of which could

reasonably be expected to risk circumvention of the law." Dkt. No. 46-1 at 8. But if Defendants

cannot show how a staffing number constitutes a technique or procedure used for law enforcement

investigations or prosecutions, they cannot withhold information staffing numbers pursuant to

Exemption 7(E). *Det. Watch Network v. United States Immigr. & Customs Enf't,* 215 F. Supp. 3d

256, 267 (S.D.N.Y. 2016). The terms "techniques" and "procedures" refer to specific methods of

law enforcement, not policy and budgetary choices about the assignment of personnel. *Families*

*for Freedom v. C.B.P.*, 837 F. Supp. 2d 287, 299 (S.D.N.Y. 2011). Moreover, techniques and

procedures that are "generally known to the public" – for example, because community members

witness large numbers of agents executing immigration enforcement operations – are not shielded

by Exemption 7(E). *Am. Immig. Council*, 950 F. Supp. 2d at 247.

---

[17] *See, e.g.*, Nina Bernstein, "U.S. Immigrant raids went for many nonfugitives," N.Y. TIMES (Feb. 4, 2009), *available at* https://www.nytimes.com/2009/02/04/world/americas/04iht-immig.4.19929389.html?searchResultPosition=2 (discussing the disclosure via FOIA request of high-level officials' "directives" memoranda containing "target goals" for arrests of immigrants in ICE raids).

## V. Some Withheld Information Has Been Previously Disclosed or is Otherwise Known to the Public.

Even if redacted information in the Fourth Amendment Refresher Training and the ERO Fugitive Operations Manual could be characterized as shielded by Exemption 5 or Exemption 7(E), ICE and DHS have previously released information that is near-identical to the information withheld here and have thus waived their right to withhold it now. "Voluntary disclosures of all or part of a document may waive an otherwise valid FOIA exemption." *N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 114 (2d Cir. 2014) (internal citations and quotations omitted).[18] This principle applies to the attorney-client and deliberative process privileges. *Id*. Earlier iterations of the Fourth Amendment Refresher Training and the ERO Fugitive Operations Manual have been disclosed via FOIA cases the recent past, and staffing numbers are well known to the public.

As noted in Section IV.a. *supra*, Defendants released final versions of the Fourth Amendment Refresher Training[19] and the 2014 ERO Fugitive Operations Handbook in previous FOIA productions,[20] revealing pages and information that are redacted in the latest version provided by ICE in the instant case. *See* Wachtenheim Decl. Exs. 14, 15, 16. The fact that some changes may have been made in the intervening years does not change this analysis. *N.Y. Times Co.*, 756 F.3d at 120 ("absolute identity" with previously disclosed information not necessary to demonstrate waiver). A FOIA requester would have little need for undisclosed information if it had to match precisely the information that was previously disclosed. *Id.* Because these documents

---

[18] In this litigation, Plaintiffs have continuously sought unredaction of domain names in emails Defendants are producing. Plaintiffs have not otherwise challenged Defendants' application of Exemptions 6 or (7)(c) with respect to emails. If this Court orders supplemental and new productions, Plaintiffs would expect that Defendants' future productions reveal domain names in email addresses.

[19] *Immigrant Def. Project v. ICE,* No. 14-cv-06117 (JPO) (filed Aug. 5, 2014).

[20] *Nat'l Immigr. Project of Nat'l Laws. Guild v. Immigr. & Customs Enf't, No*. 17-CV-02448 (APM), 2020 WL 5798429 (D.D.C. Sept. 29, 2020).

were released in the past and Defendants have failed to indicate material changes for the latest versions of either, Defendants waive their FOIA exemption.

Further, the number of agents deployed has been made public in other contexts— these raids have been repeatedly witnessed by members of targeted communities and publicized more broadly in the ensuing news reporting on the raids—with none of the security consequences or "circumvention of the law" about which the government warns. DHS itself has leaked information about staffing requests and the targeting of sanctuary cities to *The New York Times*. *See supra* at 1-2 and n.1. ICE cannot demonstrate that the numbers of agents deployed to Operation Palladium or the identity of "surge sites" is unknown to the public, and there is no protection under Exemption 7 for "routine techniques or procedures which are generally known outside the Government." *Lamont v. Dep't of Justice*, 475 F. Supp. 761, 780 (S.D.N.Y. 1979) (citing H.R.Conf.Rep.No.93-1380, 93d Cong., 2d Sess. (1974)).

Even if Exemption 5 or Exemption 7(E) did apply to the contested information, government agencies have disclosed near-identical information in the past, and the exemptions are waived here.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment, grant Plaintiffs' Cross-Motion, and order Defendants to run supplemental searches of more sub-agencies and components and using more search terms, to produce documents known to be in Defendants' possession, and to lift improperly applied redactions from materials already produced.

Dated: May 2, 2022                             Respectfully submitted,
New York, NY

                                       */s/ Andrew Wachtenheim*
                                       Andrew Wachtenheim

Immigrant Defense Project
P.O. Box 1765
New York, NY 10027
(212) 725-6421
andrew@immdefense.org

*/s/ Elsa Mota*
Maria Lahood
Elsa Mota
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
emota@ccrjustice.org

*/s/ Ghita Schwarz*
Ghita Schwarz
LatinoJustice PRLDEF
475 Riverside Dr., Suite 1901
New York, NY 10115
212-219-3360
gschwarz@latinojustice.org

*Attorneys for Plaintiffs*