UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IMMIGRANT DEFENSE PROJECT; and CENTER FOR CONSTITUTIONAL RIGHTS,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>    Defendants. | Case No. 20-cv-10625 (RA) |

`

**REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Andrew Wachtenheim
Immigrant Defense Project
P.O. Box 1765
New York, NY 10027
(212) 725-6421
andrew@immdefense.org

*Attorney for Plaintiffs*

Maria LaHood
Elsa Mota (*Application for New York bar admission pending*)
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
emota@ccrjustice.org

*Attorneys for Plaintiffs*

Ghita Schwarz
LatinoJustice PRLDEF
475 Riverside Dr.
Suite 1901
New York, NY 10115
(212) 219-3360
gschwarz@latinojustice.org

*Attorney for Plaintiffs*

## **Table of Contents**

PRELIMINARY STATEMENT ....................................................................................1

SUPPLEMENTAL STATEMENT OF FACTS .........................................................1

ARGUMENT ............................................................................................................4

    I.      Defendants' Searches Were Inadequate Because They Failed To
             Arrange For The Search Of Agency Sub-Components Likely To
             Have Responsive Records And Failed To Follow Obvious Leads ..............4

           a.   Defendants were obligated to direct the FOIA Request to all
                appropriate offices and departments ......................................................4

           b.   Federal regulations obligated Defendants to arrange for a
                search of CBP ..........................................................................................5

           c.   Purported administrability concerns do not excuse Defendants'
                failure to comply with federal regulations ............................................8

    II.     Defendant DHS And ICE's Searches Were Inadequate Because They
             Failed To Use Sufficient Search Terms And Failed To Follow
             Obvious Leads ...........................................................................................9

    III.    ICE Has Failed to Justify Redacting Emails, Operations Plans, Agent
             Manuals, and Fourth Amendment Refresher Trainings Pursuant to
             Exemptions 5 and 7(E)...............................................................................11

           a.   Exemption 5 does not apply to post-decisional emails and
                operations plans or to handbooks and trainings that reflect
                agency law ..............................................................................................11

           b.   Exemption (7)(E) does not apply to finalized staffing plans, surge
                locations, or operations plans, nor to manuals and trainings
                reflecting agency law ...........................................................................13

    CONCLUSION..........................................................................................................14

## Table of Authorities

CASE                                                                                     PAGE NO.

*Allard K. Lowenstein Intern. Human Rights Project v. Dep't of Homeland Sec.*,
626 F.3d 678 (2d Cir. 2010)...................................................................................13

*Am. Immigration Council v. Dep't of Homeland Security*,
950 F.Supp.2d 221 (D.D.C 2013) ...........................................................................7

*Bishop v. U.S. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380 (S.D.N.Y. 2014) ...........14

*Brennan Ctr. for Just. v. Dep't of Just.*, 697 F.3d 184 (2d Cir. 2012)...................11, 12

*Citizens for Resp. & Ethics in Washington v. United States Postal Serv.*,
557 F. Supp. 3d 145 (D.D.C. 2021) ......................................................................11

*DeBrew v. Atwood*, 792 F.3d 118 (D.C. Cir. 2015).......................................................9

*Families for Freedom v. United States Customs & Border Prot.*,
837 F. Supp. 2d 287 (S.D.N.Y. 2011) ..................................................................13

*Huntington v. U.S. Dep't of Commerce*, 234 F.Supp.3d 94 (D.D.C. 2017)...................6

*Knight First Amend. Inst. at Columbia Univ. v. United States*
*Citizenship & Immigr. Servs.*, 30 F.4th 318 (2d Cir. 2022)........................................14

*Lynch v. City of New York*, No. 16 Civ 7355 (LAP), 2021 WL 5140728
(S.D.N.Y. Nov. 4, 2021), ......................................................................................12

*NAACP Legal Defense & Education Fund, Inc. v. Dep't of Justice*,
463 F.Supp.3d 474 (S.D.N.Y. 2020) .......................................................................7

*Nat'l Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350 (2d Cir. 2005)............11

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*,
877 F. Supp. 2d 87 (S.D.N.Y. 2012) ..................................................................9, 10

*Oglesby v. Dept. of Army,* 920 F.2d 57 (D.C.Cir.1990)................................................7

REGULATIONS

6 C.F.R. § 5.3(a)...............................................................................4, 5, 6, 8

OTHER AUTHORITIES

Caitlin Dickerson and Zolan Kanno-Youngs, *Border Patrol Will Deploy
Elite Tactical Agents to Sanctuary Cities*, N.Y. Times (Feb. 14, 2020)........................2

Caitlin Dickerson, Zolan Kanno-Youngs and Annie Correal,
*'Flood the Streets': ICE Targets Sanctuary Cities With Increased Surveillance*,
N.Y. Times (March 5, 2020)........................................................................................2

## PRELIMINARY STATEMENT

Plaintiffs filed this Freedom of Information Act (FOIA) request about massive immigration surveillance and arrest operations reported by the *New York Times* as "Operation Palladium." Through this litigation, Plaintiffs have learned that Palladium was just *one* of a number of Immigration and Customs Enforcement's (ICE) contemporaneous surge operations that included an unusual set of features: size and scope of operation, long hours of surveillance, high arrest numbers, targeting of specific cities, and deployment of Customs and Border Protection (CBP) agents to interior enforcement initiatives.

Nothing in Defendant ICE's briefing justifies the failure to use appropriate search terms or to follow obvious leads. Defendant Department of Homeland Security (DHS) failed to arrange for searches of CBP, one of the agencies likely to have responsive records, and now improperly refuses to refer the Request to CBP for a search. Further, Defendants have failed to demonstrate that the emails, operations plans, handbook for agents, or refresher training are appropriately redacted pursuant to Exemptions 5 and 7(E).  Plaintiffs and the public are entitled to understand the government's conduct during these mass operations, and the FOIA demands that such information be disclosed.

## SUPPLEMENTAL STATEMENT OF FACTS

In response to Defendants' briefing, Plaintiffs supplement their earlier statement of facts with details regarding their request and their evolving understanding of the nature of Operation Palladium.[1] In February 2020, reporters from the *New York Times* contacted Plaintiff Immigrant Defense Project (IDP) about CBP agents supporting ICE interior enforcement operations targeting

---

[1]  *See generally* Dkt. 49, Declaration of IDP Senior Advisor Mizue Aizeki.

"sanctuary" cities. Around that time, IDP received reports from New York City community members that CBP agents were conducting arrests. The *Times* again contacted IDP with questions for a follow-up article, which described "expanded surveillance operations and added manpower . . . the latest intensification in a conflict between the Trump administration and cities that refuse to help with deportations ['sanctuary' cities]."[2] The *Times* reported that this initiative would run from February through December 31, 2020, and that it was called "Operation Palladium." At the time Plaintiffs filed their Request, the only information Plaintiffs had about these operations came from the *Times* articles. Currently, the only additional information Plaintiffs have is from this lawsuit. ICE does not appear to have publicly released any additional information on these initiatives.

According to an internal email reviewed by the *Times*, "ICE leadership had requested at least 500 special agents . . . to join the enhanced arrest campaign rolling out in sanctuary cities," which followed "an earlier decision, made public [the previous] month, to deploy elite BORTAC agents—immigration SWAT teams that are normally assigned to risky border smuggling, rescue and intelligence operations—to help arrest and deport immigrants in sanctuary cities."[3] This article links "the enhanced arrest campaign" to the article published three weeks prior on BORTAC deployment in cities such as Chicago and New York "to boost the enforcement power of local [ICE] officers."[4] This information was shared with the *Times* by "two officials familiar with the secret operation" at a time of heightened community fear about ICE activity in New York. ICE agents had shot a man in the face during an arrest in Brooklyn. ICE activity in the region was at very high levels.[5] By initiating this lawsuit, Plaintiffs have learned information of which they were

---

[2] Caitlin Dickerson, Zolan Kanno-Youngs and Annie Correal, *'Flood the Streets': ICE Targets Sanctuary Cities With Increased Surveillance*, N.Y. Times (March 5, 2020).
[3] *Id.*
[4] Caitlin Dickerson and Zolan Kanno-Youngs, *Border Patrol Will Deploy Elite Tactical Agents to Sanctuary Cities*, N.Y. Times (Feb. 14, 2020).
[5] *See* Aizeki Decl. ¶ 9.

previously unaware. The records produced indicate that Palladium was just a part of a much broader immigration policing initiative by the Trump Administration, and that the *Times*'s reporting was underinclusive. Palladium was the name given to *one* of several "surge" policing operations happening simultaneously that included different DHS agencies. It also appears the name "Palladium" was assigned after the initiative was already in motion. Records produced point to Homeland Security Investigations (HSI) and CBP agents collaborating with ICE Enforcement and Removal Operations (ERO) in contexts prior to the operation being named "Palladium." Examples include:

- Email from Supervisory Border Patrol Agent (with Rio Grande Valley Special Operations Detachment, Border Patrol Tactical Unit BORTAC), Subject: SUBzERO Weekly-NYC-FUG OPS Team 3, with weekly stats report for arrest operations February 16-22 (Bates No. 484)[6];
- Emails with weekly reports from Supervisory Border Patrol Agent, BORTAC, for SUB zERO from for February 23-29 (Bates No. 468), March 1-7 (Bates No. 474), for March 8 -14 (Bates No. 479)[7];
- Email from HSI Program Manager, (A) DIV II, indicating 30 HSI Special Agents would be assigned to Operation Palladium as of February 24, and that "although the initial period of this surge corresponds with Operation Cross Check 2020, operations will continue through the remainder of the calendar year" (Bates No. 489)[8];
- Email from ICE ERO Fugitive Operations Unit Chief, February 14, 2020 referencing Palladium as "complementary" to other operations: "We need to stand up a new Op Code to support a new ICE effort. Please see attached for clarification and awareness of EAGLE codes regarding rolling operations, and the new complementary 'Operation Palladium.'" (Bates No. 794)[9];
- Email from ICE ERO Fugitive Operations Unit Chief, February 14, 2020 suggesting that Operation Palladium was announced abruptly: "I personally had no time to update you on the expansions since they broke late last night and needed to document the main intent for ERO" (Bates No. 795).[10]

---

[6] *See* Dkt. No. 50, Declaration of Andrew Wachtenheim, Ex. 2.
[7] *See id.*
[8] *See id.*, Ex. 10.
[9] *See* Dkt. No. __, Second Declaration of Andrew Wachtenheim, dated June 13, 2022, Ex. 19.
[10] *See id.*, Ex. 20.

Defendants themselves produced these records, yet now claim their search obligation is limited almost exclusively to variants of the term "Palladium," and to documents held by limited sub-agencies within ICE. Despite the clear reveal of Defendants' production—that what the *Times* was reporting on was actually multiple operations and that the deployment of agents from CBP and other non-ICE-ERO entities was a part of all of these operations—Defendants chose not to conduct obvious searches regarding the full range of operations directly related to Palladium.

## ARGUMENT

I. **Defendants' Searches Were Inadequate Because They Failed To Arrange For The Search Of Agency Sub-Components Likely To Have Responsive Records And Failed To Follow Obvious Leads.**

In three principal ways, Defendant DHS miscasts both the Request and the regulations governing FOIA, arguing that: a) the Request named only DHS and ICE sub-agencies; b) the regulations at 6 C.F.R. § 5.3(a) did not oblige them to arrange for a search of CBP; and c) if this Court allows for submissions to the DHS Privacy Office rather than requiring a request be sent to every individual FOIA office, then the Privacy Office will suffer from efficiency and administrability issues.[11] This Court should reject DHS's unfounded contention that they had no obligation to facilitate a search of CBP.

### a. *Defendants were obligated to direct the FOIA Request to all appropriate offices and departments.*

Defendants claim that the Request named only DHS and ICE and its sub-agencies as likely to have responsive records. This is not so. The Request asks that DHS and ICE "please direct this request to all appropriate offices and departments within each agency." Dkt. No. 1-1 at

---

[11] *See* Dkt. No. 54, Declaration of Catrina Pavlik-Keenan, dated May 25, 2022 ("Pavlik-Keenan Decl.") ¶¶ 7-9, 11, 13-17; *see also* Dkt. No. 56 at pp. 4-8.

2. The Request then lists several examples of DHS and ICE sub-agencies and components Plaintiffs believed were likely to hold responsive records, but clearly stated that these were examples and suggestions and that the Request was "not limited to" this list of agencies. *Id.*

Defendants claim that "[n]othing in the request . . . indicated in any way that Plaintiffs were seeking information from U.S. Customs and Border Protection." Pavlik-Keenan Decl. ¶ 11. This is also not so. The Request states, "Operation Palladium is being enforced nationwide, including in New York City, and is having an immediate and dangerous impact on the immigrant communities' safety, including sightings of Border Patrol agents in Brooklyn, New York as recently as mid-March." Dkt. No. 1-1 at 7. Plaintiffs' August 13, 2020 administrative appeal states, "DHS has planned to send immigration agents, potentially including ICE agents, into cities across the country months before the recent news of BORTAC and CBP agents at the Portland protests surfaced." Second Wachtenheim Decl., Ex. 18. Defendants have also had ample opportunity to ask about Plaintiffs' interest in records from CBP but did not do so.

### b. *Federal regulations obligated Defendants to arrange for a search of CBP.*

Defendants further claim that 6 C.F.R. § 5.3(a) did not oblige them to arrange for a search of CBP. This misreads the plain text and intent of the regulation, and impermissibly transfers the burden of knowing which agency components hold responsive records from the agency to requesters.

Defendants maintain that 6 C.F.R. § 5.3(a)(1) directs requests be filed with the specific agency component that maintains the records sought. *See* Pavlik-Keenan Decl. ¶ 8. But they also acknowledge that the regulation's next subsection, § 5.3(a)(2), explicitly allows for a requester to submit a request to the DHS Privacy Office, *see* id. at ¶ 9, which is what Plaintiffs did. Plaintiffs urge this court to reject Defendants' assertion that Plaintiffs should have followed some heightened

set of procedures not found in the regulations. Defendants also reference something they call the "DHS FOIA Reference Guide" as a source of further instructions to requesters, *see* id. at ¶ 8, but Plaintiffs have been unable to locate such a guide anywhere.

Defendants state that, under § 5.3(a)(2), submission to the Privacy Office "is typically done when requesters are unclear as to which component/office their request should be sent." Id. at ¶ 9. This was Plaintiffs' situation, who did not know exactly which components of DHS would hold responsive records. The role of CBP was not fully known to Plaintiffs when they filed the Request. And so Plaintiffs submitted the Request to ICE, which is known to be in charge of interior enforcement operations, and to the parent agency DHS and asked that they forward the Request to components likely to have responsive records. Defendants now seek to weaponize the regulation to assume some broad authority to search only a limited number of agencies rather than to look for the agencies (however many) that may actually have useful information. *See* id. ("DHS PRIV forwards the request to components '*it determines to be most likely* to maintain the records being sought.' DHS PRIV makes this determination based on the four corners of the FOIA request and its knowledge of DHS components' respective areas of responsibility." [emphasis original]). This is contrary to the FOIA.

Defendants have not argued that CBP and other agencies are unlikely to hold responsive records. They have stated only that they did not process the Request as one seeking CBP records, and that it would be challenging to the DHS Privacy Office to have to refer requests to the FOIA offices of its sub-components. But courts have rejected these kinds of excuses for failing to search. *See, e.g.*, *Huntington v. U.S. Dep't of Commerce*, 234 F.Supp.3d 94, 103-104 (D.D.C. 2017) ("In the absence of an affidavit containing the specific assertion that the [agency] searched *all* locations likely to contain responsive documents, the Court must conclude that a genuine issue of material

fact remains as to whether the agency's efforts were sufficient.") (emphasis in original); *Am. Immigration Council v. Dep't of Homeland Security*, 950 F.Supp.2d 221, 230 (D.D.C 2013) (internal quotations omitted; emphasis original) ("In order for [ICE's search] methodology to be sufficient, ICE would, at a minimum, have to aver that it has searched all files likely to contain relevant documents."); *Oglesby v. Dept. of Army,* 920 F.2d 57, 68 (D.C.Cir.1990) ("the agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested.").

Defendants are perfectly positioned to know that CBP likely holds responsive records and should have advised the DHS Privacy Office or any other DHS FOIA office accordingly. Of course it is not expected that staff of the Privacy Office—such as the declarants in this litigation—know about every operation or program conducted by the dozens of offices within DHS, its thousands of employees, and its diverse mandate ranging from investigating white nationalist domestic terrorism to providing emergency services following natural disasters. Rather, Privacy Office staff have a responsibility to confer with contacts in DHS's several components for guidance on which components likely hold responsive records.

For example, DHS or ICE should have advised the Privacy Office that high-level officials within CBP were quoted in the *Times* about these issues, that CBP custodians would have responsive records, and/or that ICE holds responsive records about the role of CBP. Defendants' briefing instead argues that that if the DHS Privacy Office does not identify that an agency is likely to be responsive, then that is the end of the matter; a defendant-agency has satisfied its obligations simply by searching any sub-component. But this cannot satisfy the FOIA. *See NAACP Legal Defense & Education Fund, Inc. v. Dep't of Justice*, 463 F.Supp.3d 474, 484 (S.D.N.Y. 2020) (internal quotation marks and citations omitted) ("To satisfy the reasonableness standard . . . , an

agency must search all locations likely to contain responsive records; not simply where the records are most likely to be found.").

### c. *Purported administrability concerns do not excuse Defendants' failure to comply with federal regulations.*

DHS warns that properly referring Plaintiffs' request to all appropriate sub-agencies would open the floodgates. If the Privacy Office is tasked with referring requests to other sub-components of DHS, their system will become less efficient. Pavlik-Keenan Decl. ¶ 17. But this broad and speculative policy concern cannot undo Defendants' obligations under the FOIA.

Congress has assigned Defendants the obligation to provide responsive records to the public upon request. The implementing regulation explicitly states that the Privacy Office may be used to receive requests when the correct identity of every potentially responsive agency is unknown to requesters. 6 C.F.R. § 5.3(a)(2).

Here, Plaintiffs had limited information about DHS immigration enforcement operations taking place from February through December 2020. Plaintiffs complied with their statutory obligations to file a detailed request with appropriate agencies, asking that these agencies satisfy their obligations to seek records from the government components likely to have responsive records. Defendants hold all of the requisite knowledge and systems to produce responsive records from multiple agencies and should be ordered to do so.[12]

---

[12] The reluctance to search CBP for these documents is not isolated to this one failure. To facilitate this search of CBP, on May 24, 2022, Plaintiffs filed a new FOIA Request directly with CBP's FOIA office via FOIA Online for some of the records at issue in this lawsuit. *See* Second Wachtenheim Decl., Ex. 21. CBP initially administratively closed the Request in less than 24 hours on completely erroneous bases by manufacturing and asserting deficiencies that plainly were not there. *See* id., Ex. 22. Plaintiffs followed up by filing the same FOIA Request via FedEx rather than electronically. CBP again rejected the Request, saying it had already been filed. *See* id. Plaintiffs are now forced to file a letter with CBP demanding that they either accept and respond to the Request, or simply deny it so that we can proceed to litigation, as it is time and resource-intensive for Plaintiffs to fight with the agency to process a properly constructed Request that they keep rejecting for reasons that are entirely fabricated.

In addition, even within ICE, Defendants failed to do an adequate search. As Plaintiffs argued in their opening brief, Defendant ICE erroneously refused to search several of its sub-components likely to have responsive records. *See* Dkt. No. 51 at 13. For example, ICE's Office of Public Affairs ("OPA") appears likely to have responsive records, as ICE officers made public statements to the press about Palladium and related operations, yet ICE failed to direct the Request to OPA.

## II. Defendant DHS And ICE's Searches Were Inadequate Because They Failed To Use Sufficient Search Terms And Failed To Follow Obvious Leads.

The primary search term that Defendants used was "Palladium."[13] Defendants do not defend this aspect of their search. Nor do they explain or justify their flawed perspective that the term "Palladium" and its variations yielded sufficiently responsive materials.

But it is clear that these searches were not reasonably designed to yield all responsive records. *See* Pls. Op. Br. at 8-9, citing *DeBrew v. Atwood*, 792 F.3d 118, 122 (D.C. Cir. 2015) and *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 877 F. Supp. 2d 87, 96 (S.D.N.Y. 2012). First, the overreliance on the search term "Palladium" and its variations in unjustified and underinclusive because it is common for law enforcement to use acronyms or shorthand in referring to operations. Similarly, it is unreasonable to assume every communication or material related to Palladium would use its name.

To justify their limited search, Defendants argue that search terms such as "Sub Zero" and "HHS surge" "would not apply to Operation Palladium" and are not mentioned in the operations plan for Palladium.[14] But these terms are leads that emerged from Defendants' search, confirming that Palladium was one of several surge operations involving CBP taking place at that time.

---

[13] *See generally* Dkt. No. 46, Declaration of Lynnea Schurkamp, dated Mar. 28, 2022.
[14] *See* Dkt. No. 55, Declaration of Michele Welch, dated May 27, 2012, ¶ 8.

Similarly, Defendants did not search terms like "sanctuary cities" and "BORTAC" despite their recurrence in the production and in the *Times* articles because, they say, these terms would both be unlikely to return responsive material and also return too much material.[15] This is conclusory, provides insufficient detail, and is likely incorrect. ICE and DHS have not explained why there would be so many references to BORTAC, a CBP entity, within ICE's systems. Nor have ICE or DHS explained why *all* of its officers and systems would have so many references to sanctuary cities as to make a search unproductive. This is particularly confounding in light of the *Times* articles which indicate sanctuary cities were at the heart of the DHS surge operations running in 2020. It is also contrary to law. It is well-established that "[a]gencies have an obligation to "follow through on obvious leads to discover requested documents and the court evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 877 F. Supp. 2d 87, 103 n.79 (S.D.N.Y. 2012) (internal citations omitted).

As for Defendants' claim that terms like "Border Patrol" or "CBP" would be overinclusive, as they would sweep in, for example, any email signature line from an agent of these sub-components, Welch Decl. ¶ 9, this argument misstates Defendants' search capabilities and underplays the possibility of using search terms with connectors such as "and" or "w/in." Because communications between DHS or ICE (or the NYPD) about Palladium were precisely the kinds of records requested here, Defendants should have devised search terms that would uncover the records about ICE's collaboration with CBP in Palladium and surge operations. They cannot speculate that results would be too many and decline to try.

---

[15] Id. at ¶ 11.

**III.    ICE Has Failed to Justify Redacting Emails, Operations Plans, Agent Manuals, and Fourth Amendment Refresher Trainings Pursuant to Exemptions 5 and 7(E).**

> ***a.    Exemption 5 does not apply to post-decisional emails and operations plans or to handbooks and trainings that reflect agency law.***

ICE has failed to demonstrate that the redactions in its emails are deliberative or that the redated information in its operations plans, its ERO Fugitive Operations Handbook and the HSI Surveillance Manual ("the manuals") and Fourth Amendment Refresher Training ("the Refresher Training") are protected by the attorney-client privilege or the work product doctrine.

First, Plaintiffs do not seek genuinely deliberative, pre-decisional information about how to staff or execute operations in the redacted emails. Defs'. Reply Br. at 9-10. To the contrary, Plaintiffs assert only that the finalized information about staffing and location of ICE operations is not deliberative or pre-decisional and must be produced. Pls'. Op. Br. at 15-16. ICE's citation to case law protecting deliberative information where there has been no final decision, *see* Defs'. Reply Br. at 10 n.5, is unavailing here; clearly, at some point ICE made a final decision concerning staffing and location of operations, and where it did, that information cannot be withheld pursuant to the deliberative process privilege. "A document with 'operative and controlling effect' is not subject to the privilege, even if it may be rendered obsolete by a subsequent pronouncement." *Citizens for Resp. & Ethics in Washington v. United States Postal Serv.*, 557 F. Supp. 3d 145, 156. (D.D.C. 2021) (internal citations omitted).

ICE has a similarly weak response to Plaintiffs' argument that the Handbook and the Training are not protected by attorney work-product doctrine or attorney-client privilege. As Plaintiffs have argued, Pls'. Op. Br. at 17-18, it is clear under Second Circuit precedent that these kinds of documents do not contain privileged information, because they are "working law"—the agency's "effective law and policy" that governs the conduct of agents in the field. *Brennan Ctr.*

*for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*, 697 F.3d 184, 199-200, 202 (2d Cir. 2012). "The privilege 'may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy,' as open communication would not be 'inhibited' by the release of documents which have become part of agency law." *Id.* at 207 (quoting *Nat'l Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350, 360 (2d Cir. 2005)).

ICE argues that these documents are "not meant to bind the agency" or agents but merely reflect directions as to how to comply with "governing law imposed from outside the agency." Defs'. Reply Br. at 13. This is a surprising argument that reveals more about how agents view the authority of Article III courts, Congress, and the Bill of Rights than it does about the purportedly privileged nature of the redacted information. The ordinary purpose of a manual or training for employees is to direct them to comply with the employer's policy.

It may be true that ICE agents in practice do not face "professional sanction" for violating established law and agency policy when conducting operations in civilian areas. Defs'. Reply Br. at 12. But ICE's management failures cannot be used to place working agency law beyond the reach of the FOIA. The lone practical case ICE cites to demonstrate its point that "legal advice" to officers constitutes information protected by the attorney-client privilege or the work-product doctrine, *Lynch v. City of New York*, No. 16 Civ 7355 (LAP), 2021 WL 5140728 (S.D.N.Y. Nov. 4, 2021), does not address working agency law. Instead, *Lynch* involved advice given by an attorney to individual arresting officers regarding specific arrests at a "particular demonstration" on an identified date. 2021 WL 5140728 at *4. The analysis there does not in any way undermine Second Circuit precedent that the agency's "effective law and policy" is not protected by the Exemption 5. *Brennan Ctr.*, 697 F.3d at 202.

> **b. Exemption (7)(E) does not apply to finalized staffing plans, surge locations, or operations plans, nor to manuals and trainings reflecting agency law.**

Neither the redactions of staffing and surge locations in the produced emails nor the redacted information in the manuals or the Refresher Training can be withheld under Exemption 7(E).

ICE's staffing plans and surge locations are not "techniques and procedures" under Exemption 7(E) because they do not "refer[] to how law enforcement officials go about investigating a crime." *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010). Instead, this information, which deals with "resource allocation," falls under the category of "guidelines." *Id*. But to justify redacting such guidelines, ICE must show that disclosure could be "reasonably expected to risk circumvention of the law." 5 U.S.C. § 552 (b)(7)(E). This ICE has not done.

The risks of circumvention of the law "are lowest in the context of historical information." *Families for Freedom v. United States Customs & Border Prot.*, 837 F. Supp. 2d 287, 300 (S.D.N.Y. 2011). The operations discussed in the emails are over; they occurred in 2020. "Release of historical staffing statistics could not reasonably be expected to risk circumvention of the law." *Id*. Nowhere do ICE's declarations explain how the release of staffing numbers, operations plans, or surge locations from a three-year-old enforcement program could harm operations now. The information must be disclosed.

As for the manuals and the Refresher Training, Exemption 7(E) does not apply to their discussions of the legal basis for agents' conduct any more than does Exemption 5. Agency policy on how to properly conduct surveillance or operations while complying with federal law is not a "technique and procedure" of law enforcement or a guideline that if disclosed would risk "circumvention of the law." 5 U.S.C. § 552 (b)(7)(E). In contrast to the discrete and specified

13

materials deemed to fall under Exemption 7(E) in *Knight First Am. Inst. v. United States Citizenship & Imm. Servs.*, 30 F. 4th 318 (2d Cir. 2022), or *Bishop v. U.S. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380 (S.D.N.Y. 2014), the manuals are redacted in wide swaths that cover not just specific questions regarding ineligibility for immigration benefits or reasons for screening particular individuals at the border, but rather large-scale policy about agents' conduct in neighborhoods and communities. Further, unlike the materials at issue in *Knight*, as Plaintiffs have demonstrated, highly similar materials are already in the public domain, including earlier versions of the ERO Fugitive Operations Handbook and the Refresher Training. Pls'. Op. Br. at 23-25. Finding the Handbook does not require "an enterprising researcher" to reconstruct what ICE must have stated by interviewing agents and reconstructing what they were taught. *Cf. Knight*, 30 F.4th at 333. Instead, ICE itself has released such information to the public in the past. The information should be disclosed. In the alternative, to the extent that there is any doubt about the contents of these materials, Plaintiffs request that the court examine the disputed documents *in camera*. *See, e.g., Bishop*, 45 F.3d at 390.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment, grant Plaintiffs' Cross-Motion, and order Defendants to run supplemental searches of more sub-agencies and components and using more search terms, to produce documents known to be in Defendants' possession, and to lift improperly applied redactions from materials already produced.

Dated: June 13, 2022                      Respectfully submitted,
New York, NY

                                      */s/ Andrew Wachtenheim*
                                      Andrew Wachtenheim

Immigrant Defense Project
P.O. Box 1765
New York, NY 10027
(212) 725-6421
andrew@immdefense.org

*/s/ Elsa Mota*
Maria LaHood
Elsa Mota
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
emota@ccrjustice.org

*/s/ Ghita Schwarz*
Ghita Schwarz
LatinoJustice PRLDEF
475 Riverside Dr., Suite 1901
New York, NY 10115
212-219-3360
gschwarz@latinojustice.org

*Attorneys for Plaintiffs*