USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IMMIGRANT DEFENSE PROJECT and
CENTER FOR CONSTITUTIONAL
RIGHTS,

                              Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT,

                              Defendants.

---

No. 20-cv-10625 (RA)

<u>OPINION & ORDER</u>

---

RONNIE ABRAMS, United States District Judge:

The Immigrant Defense Project and the Center for Constitutional Rights (collectively "Plaintiffs") bring this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, against the United States Department of Homeland Security ("DHS") and United States Immigration and Customs Enforcement ("ICE," and collectively "Defendants"). Plaintiffs seek information concerning an immigration enforcement initiative called "Operation Palladium." Since the filing of the complaint, Defendants have made rolling productions of responsive documents totaling 1,274 pages. The parties now cross-move for summary judgment on the adequacy of Defendants' search and the applicability of Defendants' claimed exemptions. For the reasons that follow, the parties' motions are granted in part and denied in part.

## BACKGROUND

According to Plaintiffs, "Operation Palladium" is an "immigration surveillance and policing initiative that ICE has implemented in numerous cities across the United States since February 2020." Compl. ¶ 2. The initiative was allegedly implemented as part of the Trump

administration's "widely publicized anti-immigration agenda." *Id.* ¶ 13.  Plaintiffs allege that, despite the "escalation in aggressive tactics by immigration agents" that corresponded with Operation Palladium, "DHS and ICE have disclosed minimal, if any, information about the policies and guidelines for targeting and surveilling noncitizens" under the initiative. *Id.* ¶¶ 2-3.

As a result, on June 17, 2020, Plaintiffs submitted a FOIA request to Defendants (the "Request").  The Request sought the following information, as summarized in the complaint:

- DHS and ICE policies, memos, or guidances, relating to Operation Palladium;
- DHS and ICE policies, memos, training materials or guidances relating to surveillance tactics;
- Any and all records regarding the process ICE uses to determine who to target as part of Operation Palladium;
- Emails that reference "Operation Palladium" between DHS or ICE and the New York Police Department, from December 1, 2019 to March 31, 2020;
- Field Operations Worksheets from the New York Field Office dated between January 1, 2020 to April 1, 2020.

*Id.* ¶ 28; *see also id.*, Ex. A.  Plaintiffs filed this lawsuit after exhausting FOIA's administrative process and receiving no responsive records.  Over the course of the next year, ICE made eight rolling productions totaling 1,274 pages.  *See* Schurkamp Decl. ¶ 40; Defs. Br. 3 n.2.  Responsive materials were also redacted and withheld pursuant to FOIA Exemptions (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).  Schurkamp Decl. ¶ 40; *see* 5 U.S.C. § 552(b).  Although Plaintiffs asked Defendants to "direct this request to all appropriate offices and departments within each agency," Compl., Ex. A, the only agencies that conducted searches were ICE Enforcement and Removal Operations ("ERO") and, after negotiations between the parties, ICE Homeland Security Investigations ("HSI").

The parties then filed cross-motions for summary judgment.  Defendants contend that the search was reasonable under FOIA, and that ICE properly withheld materials under the claimed

exemptions.  Plaintiffs challenge both the adequacy of the search and the withholding of material

pursuant to Exemptions (b)(5) and (b)(7)(E).[1]

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material

if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d

46, 49 (2d Cir. 2009) (internal quotation marks omitted).  In determining whether there is a genuine

issue of material fact, the Court must view all facts "in the light most favorable to the non-moving

party." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001).  "Challenges to a

government agency's response are usually resolved at summary judgment in FOIA actions." *Det.*

*Watch Network v. U.S. Immigr. & Customs Enf't*, 215 F. Supp. 3d 256, 261 (S.D.N.Y. 2016).

"FOIA was enacted to promote honest and open government, and to ensure public access

to information created by the government in order to hold the governors accountable to the

governed." *Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012) (internal citation and

quotation marks omitted).  The statute "strongly favors a policy of disclosure and requires the

government to disclose its records unless its documents fall within one of the specific, enumerated

exemptions set forth in the Act." *Nat'l Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350,

355 (2d Cir. 2005) (internal citation omitted).  Agencies "ha[ve] a duty to construe a FOIA request

---

[1] In their summary judgment briefing, Plaintiffs do not challenge Defendants claimed exemptions under (b)(6) and (b)(7)(C).  The Court thus considers those arguments to be abandoned.  *See Jackson v. Federal Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned.").

liberally," *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995),[2] and "FOIA exemptions are construed narrowly," *Long*, 692 F.3d at 190. "[A] court is to resolve all doubts in favor of disclosure." *Id.*

On a motion for summary judgment in a FOIA case, "the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994). "Summary judgment is appropriate where the agency declarations describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record or by evidence of agency bad faith." *Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 327 (2d Cir. 2022) (internal quotation marks omitted). Agency declarations must be "sufficiently detailed to have the exemption appear logical and plausible," *Am. Oversight v. U.S. Dep't of Just.*, 45 F.4th 579, 587 (2d Cir. 2022), and cannot be based on "merely conclusory statements," *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999).

## DISCUSSION

### I.     Adequacy of the Search

An adequate search under FOIA is "reasonably calculated to uncover all relevant documents within the scope of the FOIA request." *Radcliffe v. I.R.S.*, 328 F. App'x 699, 700 (2d Cir. 2009). "An agency's search need not be perfect, but rather need only be reasonable." *McDonald v. Barr*, 791 F. App'x 277, 278 (2d Cir. 2020) (quoting *Grand Cent. P'ship*, 166 F.3d

---

[2] "Courts in the Second Circuit frequently cite FOIA decisions from the D.C. Circuit as it is a 'jurisdiction with considerable experience on FOIA matters.'" *Welby v. U.S. Dep't of Health & Human Servs.*, No. 15-cv-195, 2016 WL 1718263, at *4 n.5 (S.D.N.Y. Apr. 27, 2016) (quoting *Estate of Ghais Abduljaami v. U.S. Dep't of State*, No. 14-cv-7902, 2016 WL 94140, at *5 n.2 (S.D.N.Y. Jan. 7, 2016)).

at 489).  "Although an agency need not expand a search beyond the four corners of the language of the request, it must 'adhere to the full scope or the precise language of the plaintiff's request.'" *Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*, 560 F. Supp. 3d 810, 821 (S.D.N.Y. 2021) (internal citation omitted) (quoting *Charles v. Office of Armed Forces Medical Exam'r*, 730 F. Supp. 2d 205, 216 (D.D.C. 2010)).  "[T]o establish the adequacy of a search, agency affidavits must be relatively detailed and nonconclusory, and submitted in good faith."  *Grand Cent. P'ship*, 166 F.3d at 488-89 (internal quotation marks and alterations omitted). "If the record 'leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper.'"  *Banks v. U.S. Dep't of Just.*, 700 F. Supp. 2d 9, 14 (D.D.C. 2010) (quoting *Truitt v. U.S. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).

Plaintiffs challenge the adequacy of the search in two ways: (1) the custodians searched and (2) the search terms used.  The Court will address each in turn.

### A.  Custodians Searched

First, Plaintiffs argue that Defendant ICE failed to search additional offices within the agency that were likely to have responsive records.[3]  The only two sub-agencies that performed searches were ERO and, after Defendants agreed to supplemental searches, HSI.  Plaintiffs argue that it was unreasonable for ICE not to additionally search the ICE Office of Public Affairs

---

[3] In Plaintiffs' original motion for summary judgment, they also challenged the adequacy of Defendant DHS's search.  Specifically, Plaintiffs argued that it was unreasonable for DHS not to search its own Headquarters or Customs and Border Protection ("CBP").  In a letter filed after the initial motions were submitted, however, the parties stated that they had "resolved the HQ aspect of DHS's search," and that "Plaintiffs' challenge to DHS's search on these cross-motions concerns only DHS's decision not to refer the FOIA request to CBP for a search."  ECF No. 52.  While the cross-motions for summary judgment were pending in this case, Plaintiffs then filed additional FOIA requests seeking information about Operation Palladium from CBP specifically.  After receiving no responsive documents, Plaintiffs filed a related lawsuit.  *See Immigrant Def. Project v. U.S. Customs & Border Prot.*, No. 22-cv-9920 (S.D.N.Y. filed Nov. 21, 2022) ("*IDP II*").  Following a joint conference, Plaintiffs informed the Court that, given the lawsuit filed in *IDP II*, Plaintiffs were no longer challenging DHS's failure to search CBP in the instant case.  *See IDP II*, ECF No. 20.

("OPA") at a minimum.  Pls. Br. 13.  In her declaration, the Deputy FOIA Officer of the ICE FOIA Office, Lynnea Schurkamp, asserts that the FOIA Office forwarded the Request to ERO because that office "was likely to have responsive records."  Schurkamp Decl. ¶ 19.  Schurkamp further states that "Operation Palladium was an ERO-led initiative in concept and execution," and "[t]herefore, the ICE FOIA Office determined that Plaintiff's FOIA Request sought records that potentially fall within several of ERO's missions and responsibilities."  *Id.*

This explanation is plainly inadequate.  "To satisfy the reasonableness standard [under FOIA], an agency must search *all* locations likely to contain responsive records; not simply where the records are 'most likely' to be found."  *NAACP Legal Def. & Educ. Fund, Inc. v. U.S. Dep't of Just.*, 463 F. Supp. 3d 474, 484 (S.D.N.Y. 2020) (emphasis added); *see also Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 877 F. Supp. 2d 87, 98 (S.D.N.Y. 2012) (citing *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)) ("[T]he government is not required to search only the files of the two custodians who are 'most likely' to have responsive records; it must also search other locations that are reasonably likely to contain records."); *DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015) ("FOIA requires [the agency] to search all locations 'likely' to contain [responsive] documents.").  ICE does not assert that ERO was the *only* location likely to maintain responsive records.  Nor does ICE explain why other sub-agencies were unlikely to possess responsive records.  And the fact that "Operation Palladium was an ERO-led initiative in concept and execution" does not rule out the possibility that other offices were also involved in its implementation.  ICE's declarations, however, are devoid of any further detail regarding the offices it chose to search—and not to search—and why.

In particular, ICE provides no justification for its decision not to search OPA.  Although Plaintiffs did not specifically ask for records concerning ICE's public messaging on Operation

Palladium, they broadly seek "DHS and ICE policies, memos or guidances relating to 'Operation Palladium,'" which would include records related to the public communication of those policies. *See Austin Sanctuary Network v. U.S. Immigr. & Customs Enf't*, No. 20-cv-1686, 2022 WL 4356732, at *11 (S.D.N.Y. Sept. 19, 2022) (reasoning that, although "the FOIA Request did not seek documents or communications concerning ICE's public outreach or media messaging," the Request sought "any and all records that relate to ICE's policies regarding civil fine[s] and penalties," and "[r]ecords related to the public communication of those policies and how they are enforced would clearly qualify"); *see also Immigrant Def. Project v. U.S. Immigr. & Customs Enf't*, 208 F. Supp. 3d 520, 531-32 (S.D.N.Y. 2016) ("OPA's stated reason that it need not search for responsive documents underestimates the Office's obligation under FOIA.  An agency must construe FOIA requests liberally." (internal quotation marks omitted)).  Because ICE does not even attempt to justify—much less dispute—its decision not to search OPA, it has not met its burden of demonstrating "beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents."  *Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 95 (S.D.N.Y. 2012) (quoting *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007)).  The ICE Office of Public Affairs therefore should have been searched.[4]

### B.  Search Terms

Second, Plaintiffs argue that Defendants' search terms were inadequate because they excluded clearly relevant search terms and used inconsistent search terms across offices.

---

[4] Plaintiffs also suggest that it was unreasonable for ICE not to search "ERO-Operations Support" (which the Court assumes to be a division within ERO) and the Office of the Principal Legal Advisor ("OPLA"), beyond a redacted version of the Fourth Amendment Refresher Training that was produced from OPLA after negotiations between the parties.  ICE similarly offers no justification for its decision not to search either of those offices.  To the extent ICE cannot provide such a justification that is "relatively detailed and nonconclusory," *Grand Cent. P'ship*, 166 F.3d at 488-89, ICE must search those offices as well.

"In general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request." *Immigrant Def. Project*, 208 F. Supp. 3d at 528 (quoting *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015)). Rather, an agency "has discretion to craft the search terms that they believe to be reasonably tailored to uncover documents responsive to a FOIA request." *Knight First Amend. Inst.*, 560 F. Supp. 3d at 823 (internal quotation marks omitted). In addition, "there is no requirement that an agency use identical search terms in all of its offices." *Fox News Network, LLC v. U.S. Dep't of the Treasury*, 739 F. Supp. 2d 515, 534 (S.D.N.Y. 2010).

Nonetheless, "an agency's choice of search terms is not conclusive," and "[w]here challenged, agencies have to explain why certain search terms, clearly relevant, were not used." *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*, 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019); *see also Immigrant Def. Project*, 208 F. Supp. 3d at 528 ("Courts in this District have found that agencies fulfilled their obligation under FOIA even where the agency failed to search certain terms listed in the FOIA request or emphasized by a plaintiff, so long as the agency provided an explanation as to why the search term was not used."); *Knight First Amend. Inst.*, 560 F. Supp. 3d at 823 ("[A]n agency must offer a reasonable justification for how the limited search terms used were reasonably likely to yield responsive results."). Similarly, where the inconsistency of the search terms is challenged, the agency must provide an "explanation of why its search terms varied" across offices. *Fox News Network*, 739 F. Supp. 2d at 534.

The Court will begin with the inconsistency of search terms used. Within ERO, the Criminal Alien Division searched the terms "Operation Palladium," "Use of Ruses in Enforcement Operations," "surveillance tactics," "TRSS," "Thomson Reuters," "CLEAR," and "Palladium"; the Fugitive Operations Division searched the terms "NYPD" and "Palladium"; and all the other sub-agencies that conducted searches—including the Targeting Operations Division, ERO

Training Division, Headquarters ERO Field Operations, and New York City field office—only used the search terms "Palladium" or "Operation Palladium." Schurkamp Decl. ¶¶ 22-30. Within HSI, the HSI Policy Unit searched "surveillance" and "surveillance tactics"; the HSI Academy searched "surveillance" and "10029.2"; and the Special Agent-in-Charge Office of New York searched "Operation Palladium" and "ERO." *Id.* ¶¶ 35-37.

ICE provides no explanation for these discrepancies. Schurkamp's declaration includes a description of each office's duties, *id.* ¶¶ 22-30, 35-37, but those descriptions do not provide any insight as to why some offices found certain search terms to be relevant—such as "surveillance tactics," which is expressly listed in the Request—and other offices did not. *Cf. Fox News Network*, 739 F. Supp. 2d at 534 ("For each office, [the] Treasury [Department] has explained how the particular search terms were selected to target that office's involvement with AIG, Citigroup and TARP [the subjects of the FOIA request]. For example, OLA searched primarily for documents concerning EESA, as its involvement was primarily related to the passage of EESA."). Without any explanation, let alone a reasonable one, the inconsistency of search terms used demonstrates the inadequacy of the search within ERO and HSI. *See Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Immigr. & Customs Enf't*, 571 F. Supp. 3d 237, 246 (S.D.N.Y. 2021) ("[T]he disparity between the search terms used by various sections also indicates that the search was inadequate where some divisions failed to use what other divisions deemed clearly relevant search terms."); *Austin Sanctuary Network*, 2022 WL 4356732, at *12 ("ICE has provided no explanation whatsoever for the disparities in searches amongst custodians, including . . . why some employees used a relatively large number of search terms while others—sometimes within the same office and holding the same position—used just one search term.").

ICE also failed to use clearly relevant search terms identified by Plaintiffs. In a supplemental declaration, Michele Welch, a Management Program Analyst with the Information Disclosure Unit in ICE ERO, asserts that the names of other enforcement operations happening around the same time as Operation Palladium, including "Cross Check" and "Sub Zero," are not relevant because they "would not apply to Operation Palladium and are not mentioned anywhere in the Operation Palladium Operation Plan." Welch Aff. ¶¶ 7-8. But the Request expressly seeks categories of records that are *not* limited to Operation Palladium, including "[a]ny updates to ruse policies since the 2006 issuance of Torres' '*Use of Ruses in Enforcement Operations*,'" and "DHS and ICE policies, memos, training materials or guidances relating to surveillance tactics." *See* Compl. Ex. A. It was therefore unreasonable for ICE not to search the terms "Cross Check" and "Sub Zero," at least in conjunction with the terms "ruse," "surveillance," or "surveillance tactic."

The agency argues that the remainder of Plaintiffs' proposed search terms are "too broad" and would produce a "large volume of non-responsive records," including "CBP," "border patrol," "Rolling Operations," "Rolling Ops," "target list," "training," "OP," "NYPD," "Fourth Amendment," "sanctuary city," "ruse," "flood," "BORTAC," and "surge"/"surge sites." Welch ¶¶ 9-11. While that may be true, the agency does not explain why more specific search strategies, such as Boolean connectors, could not be used to narrow the field of results. *See Knight First Am. Inst.*, 560 F. Supp. 3d at 823-24 ("CDC did not use certain terms such as 'task force' and 'vice president' because it considered them likely too broad to identify responsive documents . . . CDC should determine whether other search strategies, such as Boolean connectors, might replicate these terms without such over-inclusivity."); *Gov't Accountability Project v. U.S. Dep't of Homeland Sec.*, 335 F. Supp. 3d 7, 13 n.3 (D.D.C. 2018) ("The Court appreciates DHS's concern that searches for commonly-used words like 'cell,' 'phone,' and 'test' may return too many records

for the agency to digest.  But that concern dictates using more sophisticated search techniques, including additional filtering keywords or Boolean operators and connectors, to winnow the results to a manageable level." (internal citation omitted)); *cf. Immigrant Def. Project*, 208 F. Supp. 3d at 528-529 (reasoning that, because the defendants "aver that search strategies suggested by Plaintiffs [such as Boolean connectors] would be impracticable or impossible for certain components or offices," as "[n]ot all agency systems and databases allow for such advanced searching," the plaintiffs' "insistence on a laundry list of specific search terms and strategies is therefore unavailing").  If combined in a conjunctive search, at least some of these terms, such as "Rolling Operations," "sanctuary city," and "surge," seem reasonably likely to produce a manageable number of responsive results.

Similarly, the agency argues that the term "ERO surge" is a "description of the type of operation that Operation Palladium was, but it is not unique to Operation Palladium and could describe numerous operations conducted by ICE over a multi-year period."  Welch Aff. ¶ 6.  Thus, ICE argues, "this search term would be overbroad," and "[t]o the extent that ERO surge might potentially return records relevant to Operation Palladium, ICE reasonably determined that those records were already captured by use of the search term 'Palladium.'"  *Id.*  But again, at least one sub-agency, the Criminal Alien Division, considered the search term "Palladium" on its own to be insufficient in responding to the Request.  And, as discussed, while the Request focuses on Operation Palladium, it also seeks documents beyond that operation.  At the very least, it was unreasonable for ICE not to search "ERO surge" in conjunction with other relevant search terms.

That said, ICE's decision not to search "Op Palladium" and "OP PALLADIUM" were reasonable.  As ICE explains, searching the word "Palladium" alone, which each of the custodians did, "would uncover the same amount, if not more, records" than searching the word "Palladium"

in conjunction with other terms.  Welch Aff. ¶ 14.  ICE also explains that their searches are "not case-sensitive," so "changing the capitalization of certain words would make no difference in the records returned."  *Id.* ¶ 15.  These are logical justifications, and ICE is therefore not obligated to conduct searches for "Op Palladium" and "OP PALLADIUM."

The Court thus concludes that ICE is not entitled to summary judgment with respect to the custodians searched or the search terms used, except for the terms "Op Palladium" and "OP PALLADIUM."  ICE must either provide sufficiently detailed, reasonable, and nonconclusory justifications as to why it did not search the custodians and terms identified as relevant by Plaintiffs, or, to the extent ICE chooses not to attempt to justify its prior search terms and procedures, the agency must perform a new search that is "reasonably calculated to uncover all relevant documents," *Radcliffe*, 328 F. App'x at 700, as set forth in this Opinion.

## II.     Exemption 5

"Exemption 5 of the FOIA exempts from production records that are 'inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  *Grand Cent. P'ship*, 166 F.3d at 481 (quoting 5 U.S.C. § 552(b)(5)).  The exemption "incorporates three judicially-developed (i.e., common law) privileges: the attorney-client privilege, the deliberative process privilege, and the attorney work product privilege."  *N.Y. Times Co. v. U.S. Dep't of Just.*, 939 F.3d 479, 488 (2d Cir. 2019).

### A.  Deliberative Process Privilege

Plaintiffs challenge the redaction of two documents under the deliberative process privilege: (1) an email labeled as "Operation Palladium – HSI Special Agent in Charge (SAC) Assignments to ERO Field Offices," and (2) an email labeled as "ICE HSI Assistant Special Agent in Charge (ASAC) to numerous (more than twenty) ICE employees."

"The deliberative process privilege is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." *Nat'l Council of La Raza*, 411 F.3d at 356.   The privilege thus protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotation marks omitted).  Two requirements must be met for the deliberative process privilege to apply.  "First, the document must be 'predecisional,' that is, 'prepared in order to assist an agency decisionmaker in arriving at his decision.'" *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 84 (2d Cir. 1991) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)).  "Second, the document must be 'deliberative,' that is, 'actually . . . related to the process by which policies are formulated.'" *Id.* (quoting *Jordan v. U.S. Dep't of Just.*, 591 F.2d 753, 774 (D.C. Cir. 1978)).  "The privilege does not, as a general matter, extend to purely factual material." *Id.* at 85.   Instead, "[t]he privilege protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Grand Cent. P'ship*, 166 F.3d at 482.  The Court will discuss each of the two challenged documents in turn.

### Email labeled as "Operation Palladium – HSI Special Agent in Charge (SAC) Assignments to ERO Field Offices"

Plaintiffs challenge two redactions in this document.  First, ICE redacted the identities of seven ERO Field Offices known as "surge sites."  The agency's *Vaughn* index,[5] however, provides

---

[5] "A *Vaughn* index is a list of documents, identified by number, title and description, that a Government agency determines are responsive to a FOIA request.  The index states the one or more FOIA exemptions that the agency claims justify withholding each document.  The term derives from the case *Vaughn v. Rosen*, 484 F.2d 820, 821 (D.C. Cir. 1973)." *Am. C.L. Union v. U.S. Dep't of Just.*, 844 F.3d 126, 129 n.4 (2d Cir. 2016).

no explanation as to why the identities of those Field Offices are predecisional or deliberative, which is plainly insufficient. *See Knight First Am. Inst.*, 30 F.4th at 330 ("To justify withholding [under a FOIA exemption], an agency must provide a relatively detailed analysis of the withheld material in manageable segments without resort to conclusory and generalized allegations of exemptions.").

Second, ICE redacted the "potential number range of SAC [officers]" to be deployed to each ERO Field Office. The *Vaughn* index explains that, "[b]ecause many of the assigned numbers [of SAC officers] are a range as opposed to a specific number, the exact number of SACs to be assigned were in flux and uncertain, and to be determined by ERO leadership at local offices." Schurkamp Decl., Index at 5. The fact that "the exact number of SACs to be assigned" was to be determined by local offices, however, does not mean that the "number range[s]" conveyed in this document were not meant to be operative. *See Knight First Amend. Inst.*, 560 F. Supp. 3d at 831 ("A policy in development can be operative in an interim form, as long as the agency at some point intended it to have 'operative effect.'"); *see also Am. C.L. Union v. U.S. Dep't of Def.*, No. 15-cv-9317, 2017 WL 4326524, at *8 (S.D.N.Y. Sept. 27, 2017) ("More guidance soon . . . does not undercut the finality of the guidance already given."). Furthermore, mere staffing numbers are more akin to "purely factual material," *Hopkins*, 929 F.2d at 85, than they are to "subjective documents which reflect the personal opinions of the writer," *Grand Cent. P'ship*, 166 F.3d at 482. While the Court does not doubt, as ICE argues, that "how to staff the operation" was a "policy-laden [question] with which ICE had to grapple," Defs. Reply Br. 9, the *Vaughn* index does not suggest that the redacted information in this particular document reflected any deliberations of that policy question.[6] *See Knight First Amend. Inst.*, 560 F. Supp. 3d at 831 ("These descriptions do

---

[6] Similarly, although the agency asserts, in general terms, that "ICE withheld pre-decisional, deliberative internal discussions, deliberations, and recommendations regarding the operational plans and utilization of

not reflect a procedure circulated for discussion, but a process transmitted to subordinates for application, if only for a short period.  Therefore, any discussion of its application was post-decisional, and outside the scope of the privilege.").

*Email labeled as "ICE HSI Assistant Special Agent in Charge (ASAC) to numerous (more than twenty) ICE employees"*

According to the *Vaughn* index, in the redacted section of this document, "the ASAC informs the agents on the email of the methodology of how agents will be selected for upcoming operations and that all agents should get their cases up to date with statistics and program codes." Schurkamp Decl., Index at 6.  Nothing in that explanation suggests the redacted information is predecisional or deliberative.  Indeed, this email falls squarely in the category of "process[es] transmitted to subordinates for application," which are not exempt from disclosure.  *Knight First Amend. Inst.*, 560 F. Supp. 3d at 831.

Thus, neither of these documents are protected by the deliberative process privilege, unless ICE provides nonconclusory explanations demonstrating that these documents are both predecisional and deliberative.  ICE is directed to either update its *Vaughn* index accordingly or produce the redacted portions of the contested documents, unless subject to other exemptions.[7]

---

resources for Operation Palladium at specific ERO field offices," Schurkamp Decl. ¶ 43, this statement does not explain how the redacted staffing numbers themselves reflect policy deliberations.

[7] If ICE cannot provide a sufficient justification without disclosing sensitive information, the Court can review the document *in camera*.  *See Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 31 (D.C. Cir. 1998).  That said, "*in camera* review is considered the exception, not the rule," *Local 3, Int't Bhd. of Elec. Workers, AFL-CIO v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988), and a "'district court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions' before undertaking *in camera* review." *Austin Sanctuary Network*, 2022 WL 4356732, at *6 (quoting *Am. C.L. Union v. U.S. Dep't of Just.*, 210 F. Supp. 3d 467, 485 (S.D.N.Y. 2016)).  The same principle applies to the discussion of the remaining exemptions in this Opinion.

### B.  Attorney-Client Privilege

Plaintiffs challenge the redaction of the following three documents made pursuant to the attorney-client privilege: (1) the ERO Fugitive Operations Handbook, (2) the OPLA Fourth Amendment Refresher Training, and (3) the Operation Plans for Operation Palladium for the New York and Newark Field Offices.

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance."  *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*, 697 F.3d 184, 207 (2d Cir. 2012) (quoting *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011)).  "The privilege does not allow an agency to withhold a document merely because it is a communication between the agency and its lawyers."  *Jud. Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 267 (D.D.C. 2004).  Rather, "[t]he Government must establish that the communication was made in confidence and that the confidence has been kept."  *Austin Sanctuary Network*, 2022 WL 4356732, at *25; *see also Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 811 F. Supp. 2d 713, 736 (S.D.N.Y. 2011) ("The agency bears the burden of showing that the information exchanged was confidential.").  "The privilege also does not apply to "a government attorney's advice on political, strategic, or policy issues."  *Austin Sanctuary Network*, 2022 WL 4356732, at *25 (quoting *Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336, 347 (D.D.C. 2018)).

ICE has not met its burden in establishing that the allegedly privileged communications were made in confidence and have remained confidential.  For each of the challenged documents over which ICE asserts an attorney-client privilege, the *Vaughn* index states the following (or a substantially similar version of the following): "Sections of the document contain legal guidance

16

from Office of Principal Legal Advisor (OPLA) attorneys.  These particular sections provide OPLA's opinions and guidance to ERO." Schurkamp Decl., Index at 8; *see id.* at 3, 10-11.  The *Vaughn* index further states, in general and conclusory terms, that "[a]ttorney-client communications are shielded from disclosure in order to encourage a full and frank discussion between the client and their legal advisor." *Id.* at 3, 8, 11.  Schurkamp's declaration similarly states, in conclusory fashion: "The attorney-client privilege applies to a category of records that contain confidential communications between ICE attorneys and their clients (ERO and HSI employees) relating to legal matters for which the client has sought professional legal advice." Schurkamp Decl. ¶ 46. These assertions fail to "affirmatively establish [the] confidentiality" of these particular documents, as the agency is required to do.  *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) (observing that "[t]he burden is on the agency to demonstrate that confidentiality was expected in the handling of these communications," and "conclusory assertions of privilege will not suffice to carry the Government's burden of proof in defending FOIA cases"); *see also Austin Sanctuary Network*, 2022 WL 4356732, at *26 (concluding that ICE failed to establish the confidentiality of the allegedly privileged documents because, "while ICE has made representations about the confidential nature of the communications at the time they were made, they make no representations that such confidentiality was maintained"); *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 519 (S.D.N.Y. 2010) (citing *Coastal States*, 617 F.2d at 863) ("The burden is on the agency to demonstrate that confidentiality was expected in the handling of these communications and that it was reasonably careful to keep this confidential information protected from general disclosure.").

Plaintiffs additionally argue that these documents are not covered by attorney-client privilege because they constitute "final agency policy" or "working law."  The Court disagrees.  It

is true that, "[l]ike the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy." *Nat'l Council of La Raza*, 411 F.3d at 360. But Plaintiffs do not point to any evidence in the record indicating that these documents have been adopted as final agency policy. *Cf, e.g., id.* at 359 (concluding that an OLC Memorandum was adopted by the agency as working law because "[t]he record makes clear that the Department embraced the OLC's reasoning as its own," in that "[t]he OLC Memorandum was used by the agency in its dealings with the public as the sole legal authority for the Department's claim that its new policy had a basis in the law," and "the Department repeatedly invoked the OLC Memorandum to assure those outside of the agency that its policy was lawful and to encourage states and localities to take actions that the Department desired" (internal citation omitted)). In the *Vaughn* index, ICE asserts that these documents provide "legal guidance" on topics such as "the handling of gang members," "how to review and prepare arrest warrants," and "use of force," to name a few. Schurkamp Decl., Index at 3, 8, 11. While this kind of advice could certainly be implemented as final agency policy, the Court cannot conclude that these documents have been implemented as such—and would thereby fall outside the scope of the attorney-client privilege—without any evidence to that effect in the record. *See Knight First Am. Inst.*, 30 F.4th at 329 (quoting *Am. C.L. Union v. U.S. Dep't of Def.*, 901 F.3d 125, 133 (2d Cir. 2018)) ("[W]e accept an agency's affidavits as true unless they are 'controverted by either contrary evidence in the record or by evidence of agency bad faith.'"); *see also Am. C.L. Union v. Nat'l Sec. Agency*, 925 F.3d 576, 598 (2d Cir. 2019) ("To be sure, a document first drafted as legal advice can still be adopted as working law or incorporated into agency decisions. But mere agreement with a document's reasoning and conclusion is insufficient to transform advice

into law.  Instead, the document must be treated as binding by the agency (i.e., 'adoption') or explicitly relied upon in a formal decision (i.e., 'incorporation by reference').").

Thus, while these documents do not constitute working law or final agency policy, they will not be deemed protected by the attorney-client privilege unless ICE provides nonconclusory explanations establishing the confidentiality of the documents both at the time of their creation and maintained since.  ICE is directed to either update its *Vaughn* index accordingly or produce the redacted portions of the contested documents, unless subject to other exemptions.

### III.    Exemption 7(E)

Finally, Plaintiffs challenge the redaction of four documents under Exemption 7(E): (1) the ERO Fugitive Operations Handbook, (2) the OPLA Fourth Amendment Refresher Training, (3) the HSI Special Agent Training Surveillance Guide, and (4) the email labeled as "Operation Palladium – HSI Special Agent in Charge (SAC) Assignments to ERO Field Offices."

Exemption 7(E) excludes from disclosure "records and information compiled for law enforcement purposes" if such records "either (1) 'would disclose techniques and procedures for law enforcement investigations or prosecutions'; or (2) 'would disclose guidelines for law enforcement investigations or prosecutions' *and* 'such disclosure could reasonably be expected to risk circumvention of the law.'"  *Knight First Am. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 327 (2d Cir. 2022) (quoting 5 U.S.C. § 552(b)(7) and (b)(7)(E)) (emphasis in original, other emphases omitted).   "The phrase 'techniques and procedures' . . . refers to how law enforcement officials go about investigating a crime," whereas "[t]he term guidelines . . . generally refers in the context of Exemption 7(E) to resource allocation."  *Allard K. Lowenstein Int'l Human Rights Project v. U.S. Dep't of Homeland Sec*., 626 F.3d 678, 682 (2d Cir. 2010).  The Second Circuit has made clear that "the qualifying phrase ('if such disclosure

could reasonably be expected to risk circumvention of the law') modifies only 'guidelines' and not 'techniques and procedures.'"  *Id.* at 681.  For documents in the "guidelines" category, the exemption does not require a "highly specific burden of showing how the law will be circumvented."  *Mayer Brown LLP v. Internal Revenue Serv.*, 562 F.3d 1190, 1194 (D.C. Cir. 2009).  It "only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law."  *Id.* (internal quotation marks and alterations omitted).

The agency argues that the challenged redactions constitute law enforcement "techniques and procedures," or in the alternative, constitute law enforcement "guidelines" that would risk circumvention of the law if disclosed.  *See* Defs. Reply Br. 16; Schurkamp Decl., Index at 5, 9-11. The Court will discuss each document in turn.

### ERO Fugitive Operations Handbook

First, according to the *Vaughn* index, ICE redacted information about "specific law enforcement systems/databases and their identifiers."  Schurkamp Decl., Index at 9.  Multiple courts have concluded that information regarding internal databases and access procedures are exempt from disclosure.  *See, e.g.*, *Gonzalez v. U.S. Citizenship & Immigr. Servs.*, 475 F. Supp. 3d 334, 351-52 (S.D.N.Y. 2020) ("Courts frequently find that . . . case event codes and URLs of internal law enforcement databases [are] properly withheld under Exemption 7(E).") (collecting cases); *Parker v. U.S. Immigr. & Customs Enf't*, 238 F. Supp. 3d 89, 100 (D.D.C. 2017) (concluding that information such as "sensitive database and event codes, identification numbers, law enforcement system URLs, internal website links, record identification numbers, event numbers, category codes . . . and system codes" are properly withheld under Exemption 7(E)). And  regardless  of  whether  such  information  is  considered  "techniques  and  procedures"  or

"guidelines," ICE provides a reasonable explanation for why disclosure of this information would risk circumvention of the law, stating that "[k]nowledge of websites, complete email addresses, and system database codes can lead to denial-of-service attacks and/or manipulation of systems if access is gained."  Schurkamp Decl., Index at 9; *see Parker*, 238 F. Supp. 3d at 100 ("The Court agrees that disclosing this information could reasonably be expected to create a risk of circumvention by revealing how ICE's databases work and rendering them more vulnerable to manipulation.").  This redacted information is thus exempt from disclosure.

ICE also redacted from the Fugitive Operations Handbook information regarding the "administrative arrests of removable noncitizens inside the United States," including "the processes of the FOT to receive, review, and approve lead information; the considerations for developing and maintaining the cooperation of confidential informants (including systems to use); and the processes for locating and verifying the removability of noncitizens."  Schurkamp Decl., Index at 9.  Such processes logically relate to law enforcement methods for identifying and investigating targets, and thus qualify as "techniques and procedures."  *See Knight First Am. Inst.*, 30 F.4th at 330 (observing that "techniques and procedures" includes "law enforcement methods— the actions that law enforcement personnel take to identify and neutralize bad actors—as well as the triggers for the applications of methods"); *see also Freedom of Press Found. v. U.S. Dep't of Just.*, 493 F. Supp. 3d 251, 270-72 (S.D.N.Y. 2020).  Plaintiffs insist that an earlier version of the Fugitive Operations Handbook, which was voluntarily produced in a past lawsuit, "contain[s] agency law and policy for agents—not specific and technical guidelines that if learned by the public could lead to the circumvention of law."  Pls. Br. 27.  However, the Court cannot draw inferences about what the current version of the document contains based solely on earlier versions, given that the agency has provided a sworn statement regarding its actual contents.  *See*

*Knight First Am. Inst.*, 30 F.4th at 329 ("Knight asks us to draw inferences about the redacted material from context that [is] contradicted by DOS's affidavits and *Vaughn* index . . . we cannot credit Knight's contentions about what the 9 FAM redactions 'appear' to include in the face of an agency affidavit attesting to what they actually do include."). This information is thus also exempt from disclosure.

### *OPLA Fourth Amendment Refresher Training*

The agency redacted the following information from this document: "law enforcement strategies for interacting in the public (e.g., knock and talk rules)[,] handling social media and media coverage, the use of certain technologies, [and] the discussion of scenarios that demonstrate law enforcement tactics." Schurkamp Decl., Index at 11. "[T]he use of certain technologies" and "the discussion of scenarios that demonstrate law enforcement tactics" are too vague to support withholding, without any further detail as to what these "technologies," "scenarios," or "law enforcement tactics" are. *See Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 246 (D.D.C. 2013) (collecting cases) ("While the government faces a relatively low bar to show that it has properly withheld documents containing law enforcement techniques and procedures, it must nevertheless provide a relatively detailed justification for each record that permits the reviewing court to make a meaningful assessment of the redactions . . . . Generic portrayals of categories and vaguely formulated descriptions will not suffice; accordingly, the government must provide sufficient facts and context to allow the reviewing court to 'deduce something of the nature of the techniques in question.'" (quoting *Clemente v. FBI*, 741 F. Supp. 2d 64, 88 (D.D.C. 2010) (internal citation omitted)); *see also Kolbusz v. FBI*, No. 17-cv-319, 2021 WL 1845352, at *24 (D.D.C. Feb. 17, 2021) (concluding that the agency "has not cleared the relatively low bar of demonstrating the applicability of Exemption 7(E)" where the agency's

declaration asserted Exemption 7(E) over "an unnamed database that houses 'national security and investigative data'" and "allows law enforcement to query information and develop investigative leads from a variety of source data"); *Davis v. FBI*, 770 F. Supp. 2d 93, 100 (D.D.C. 2011) (concluding that the agency's "generic description of the documents as 'prosecution memoranda . . . detailing evidence gathering efforts and prosecution strategies in Mr. Davis' criminal case' does not suffice" for justifying withholding under Exemption 7(E)).

"[I]nteracting in the public" and "handling social media and media coverage," while more specific, appear by definition to be public-facing information, which is not exempt from disclosure as a "technique or procedure." *See Freedom of Press Found. v. U.S. Dep't of Just.*, 493 F. Supp. 3d 251, 271 (S.D.N.Y. 2020) (quoting *Doherty v. U.S. Dep't of Just.*, 775 F.2d 49, 52 n.4 (2d Cir. 1985)) ("Exemption 7(E) only protects techniques and procedures 'not generally known to the public.'"); *see also Am. C.L. Union Found. v. U.S. Dep't of Homeland Sec.*, 243 F. Supp. 3d 393, 404 (S.D.N.Y. 2017) ("Section 7(E) requires that the material being withheld truly embody a specialized, calculated technique or procedure and that it not be apparent to the public."). To the extent that "interacting in the public" and "handling social media and media coverage" constitute "guidelines," the *Vaughn* index does not provide an adequate explanation for how the disclosure of this information would risk circumvention of the law. The agency merely states, in conclusory fashion, that "[k]nowledge of these aforementioned law enforcement activities could permit people seeking to violate or circumvent the law to take proactive steps to counter operational and investigative actions taken by ICE during enforcement operations." Schurkamp Decl., Index at 11. While the agency does not have a "highly specific burden of showing how the law will be circumvented," this generalized statement falls short of "demonstrate[ing] logically how the release of the requested information might create a risk of circumvention of the law." *Mayer*

*Brown LLP*, 562 F.3d at 1194; *see also Am. C.L. Union Found.*, 243 F. Supp. 3d at 403 ("Courts require the government to offer more than 'generic assertions' and 'boilerplate' to justify Exemption 7(E) withholding.").

### HSI Special Agent Training Surveillance Guide

According to the *Vaughn* index, the agency redacted from this document information about "law enforcement surveillance procedures, activities, tactics, and techniques." Schurkamp Decl., Index at 10. The Court does not doubt that certain surveillance tactics are exempt from disclosure as law enforcement techniques and procedures. However, the Court cannot conclude that these particular surveillance activities constitute "techniques and procedures" based merely on the circular statement that they do. As discussed, even for asserted law enforcement activities, the government "must nevertheless provide a relatively detailed justification . . . that permits the reviewing court to make a meaningful assessment of the redactions." *Am. Immigr. Council*, 950 F. Supp. 2d at 246; *see also Banks v. U.S. Dep't of Just.*, 813 F. Supp. 2d 132, 146 (D.D.C. 2011) (concluding that the agency had not met its burden where it asserted Exemption 7(E) over "specific law enforcement techniques . . . used during the investigation of the criminal activity which resulted in plaintiff's incarceration," including "'specific surveillance methods and processes for obtaining information' not commonly known to the public"). ICE must provide some minimal description of the surveillance activities at issue, without disclosing sensitive information,[8] that allows the Court to logically conclude the redacted information is exempt. *See supra*, ERO Fugitive Operations Handbook.

---

[8] Again, the Court may conduct *in camera* review of this document if necessary, but will "first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt." *Austin Sanctuary Network*, 2022 WL 4356732, at *6 (quoting *Am. C.L. Union*, 210 F. Supp. 3d at 485).

***Email labeled as "Operation Palladium – HSI Special Agent in Charge (SAC)
Assignments to ERO Field Offices"***

Finally, for this document, the *Vaughn* index does not specify what information is being
withheld pursuant to Exemption 7(E).  To the extent the agency is using Exemption 7(E) to justify
the redaction of the number of SAC officers deployed and the location of "surge sites," as
discussed above, that information does not constitute "techniques and procedures"—indeed, the
*Vaughn* index itself describes the email as a "resource-management document."  Schurkamp Decl.,
Index at 4; *see Allard K. Lowenstein Int'l Human Rights Project*, 626 F.3d at 682 ("guidelines"
refer to "resource allocation").  And as with the Fourth Amendment Refresher Training, to the
extent these redactions constitute "guidelines" for the purposes of Exemption 7(E), the *Vaughn*
index does not adequately explain how the disclosure of this information would risk circumvention
of the law.  The index repeats substantially the same conclusory assertion that "[k]nowledge of
law enforcement resources and activities related to specific operations and jurisdictions could
permit people seeking to violate or circumvent the law to take proactive steps to counter
operational and investigative actions taken by ICE during enforcement operations," Schurkamp
Decl., Index at 5, which, as discussed above, is an insufficient justification.

In summary, the redactions in the ERO Fugitive Operations Handbook are exempt from
disclosure under 7(E), but the Fourth Amendment Refresher Training, HSI Special Agent Training
Surveillance Guide, and email labeled as "Operation Palladium – HSI Special Agent in Charge
(SAC) Assignments to ERO Field Offices" are not exempt under 7(E) unless ICE provides
sufficiently detailed justifications as set forth in this Opinion.  ICE is directed to either update its
*Vaughn* index accordingly or produce the redacted portions of the contested documents, unless
subject to other exemptions.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion is granted in part and denied in part. Defendants' motion is also granted in part and denied in part. The parties are directed to meet and confer in a good-faith effort to:

(1) agree to new search terms and a reasonable timeline for the agency's production, consistent with Part I of this Opinion; and

(2) agree to a reasonable timeline for the agency to produce new versions of the OPLA Fourth Amendment Refresher Training; HSI Special Agent Training Surveillance Guide; Operation Plans for Operation Palladium for the New York and Newark Field Offices; email labeled as "Operation Palladium – HSI Special Agent in Charge (SAC) Assignments to ERO Field Offices"; email labeled as "ICE HSI Assistant Special Agent-in-Charge (ASAC) to numerous (more than twenty) ICE employees"; and ERO Fugitive Operations Handbook, consistent with Parts II and III of this Opinion, or otherwise provide the necessary justifications for withholding under Exemptions 5 and 7(E) as set forth in this Opinion. Defendants may redact information subject to other exemptions, such as Exemptions 6 and 7(C), where warranted.

No later than February 27, 2023, the parties shall file a joint letter either notifying the Court of the agreed upon dates, or, if the parties could not reach an agreement, setting forth their respective positions.  After completing the productions described above, the parties may renew their motions for summary judgment.  The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 45 and 48.

Dated:     February 13, 2023
           New York, New York

                                          _____
                                          Ronnie Abrams
                                          United States District Judge